# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

TELE-PUBLISHING, INC.,

               Plaintiff and
               Counterdefendant,

     v.

FACEBOOK, INC. and THEFACEBOOK,
LLC,

               Defendants and
               Counterclaimants.

C.A. No. 1:09-cv-11686-DPW

## DEFENDANTS FACEBOOK, INC. AND THEFACEBOOK, LLC'S
## RESPONSE TO TPI'S OPENING CLAIM CONSTRUCTION BRIEF

TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ........................................................................................... 1

II.  ARGUMENT .................................................................................................. 1

     A.   Terms Regarding "Security Attributes" / "Security Parameters" ......................... 2

          1.   "security attributes" / "security parameters" ............................................. 2

          2.   "means for the page-creating remote user to enter security
               parameters" (claim elements 1(f), 10(e), 16(f), 21(e), 29(e), 32(e)) .......... 4

               a.   TPI Cannot Identify Corresponding Structure. ............................. 4

               b.   TPI Is Bound by the Construction It Argued to the PTO. ............. 6

          3.   "means for storing the security parameters" (32(f)) .................................. 6

     B.   Terms Regarding "Displaying" .................................................................. 7

          1.   "displaying" .......................................................................................... 7

          2.   "means for displaying the personal page" (16(g)) ..................................... 7

     C.   "(provide a page-creating remote user with) means to create a personal
          page having personal information" (29(b))/"means for creating a personal
          page having personal information for a page-creating remote user" (32(b)) ......... 8

     D.   Terms Regarding "Prompting" With A Plurality of "Page Templates" ............... 9

          1.   "page" ................................................................................................... 9

          2.    "page template" .................................................................................... 9

          3.   "prompting (a remote user)" .................................................................. 9

          4.   "providing/prompting ... with a plurality of page templates" ................... 9

          5.   "means for providing a page-creating remote user with a plurality
               of templates for selection for the personal page" (claim element
               16(b)) ................................................................................................. 10

     E.   Claim Terms Regarding "Attributes" ..................................................... 10

          1.   "attributes" ........................................................................................ 10

          2.   "means for storing attributes representing the personal information
               in the page-creating remote user's personal page in one or more
               databases" (32(c)) .............................................................................. 10

     F.   "means for the page-creating remote user to include a voice greeting in the
          personal page" (claim 27) ....................................................................... 11

     G.   Claim Terms Regarding "Profile Information" .......................................... 11

TABLE OF CONTENTS
(CONTINUED)

PAGE

1. "profile information" ............................................................................. 11

2. "accessing (by a remote user)" ........................................................... 11

3. "profile information . . . accessible to other remote users"..................... 12

4. Means-Plus-Function Elements for Accessing Profile Information and Selecting Other Remote Users (claim elements 10(d), 16(e), 23, 24, 29(d), 32(d); dependent claims 31 and 34) ............................... 12

5. "means for storing profile information relating to each remote user" (elements 16(a) and 32(a)).............................................................. 13

H. "means for contributing text" (elements 10(b) and 16(c))................................. 13

I. "means for contributing graphics" (elements 10(c) and 16(d); claim 33) ........... 14

J. Terms Regarding "Users" ................................................................................. 14

1. "remote user" ....................................................................................... 14

2. "page-creating remote user" ................................................................ 15

K. "authorization/authorized/authorizing"............................................................. 15

L. CGI Processor 92 and Other Structures Are Necessary For Performing Claimed Functions. ............................................................................................ 15

III. CONCLUSION........................................................................................................ 15

TABLE OF AUTHORITIES

PAGE(S)

CASES

*Axcelis Tech., Inc. v. Applied Materials, Inc.*,
    No. Civ. A. 01-10029-DPW, 2003 WL 21361339 (D. Mass. June 12, 2003)
    (Woodlock, J.)........................................................................................................5

*Blackboard, Inc. v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009)...........................................................................1, 5, 13

*Cardiac Pacemakers Inc. v. St. Jude Med., Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002)..........................................................................6

*Default Proof Credit Card Sys., Inc. v. Home Depot, Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005)..........................................................................6, 11, 13

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008)..........................................................................2, 10

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005)..........................................................................1

*i4i Limited Partnership v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)............................................................................8

*Individual Network, LLC v. Apple, Inc.*,
    2009 WL 81795 (E.D. Tex. 2009).......................................................................1

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003)..........................................................................5

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998)..........................................................................2

*Signtech USA, Ltd. v. Vutek, Inc.*,
    174 F.3d 1352 (Fed. Cir. 1999)..........................................................................8, 14

*Springs Window Fashions LP v. Novo Industries, L.P.*,
    323 F.3d 989 (Fed. Cir. 2003)............................................................................3

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001)..........................................................................5

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE(S)

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)......................................................................................1

**OTHER AUTHORITIES**

Local Rule 5.4(C)......................................................................................................17

## I.   INTRODUCTION

TPI's attempts to run away from its own specification and prosecution history must be rejected.  TPI made numerous statements and arguments in order to obtain allowance of its claims, and is continuing to do so in its attempts to save its rejected claims in the reexamination. Patent law binds TPI to those statements so that the public can understand what the claims cover. TPI cannot now ignore them in order to attempt to transform its patent into something it is not, just to try to make out an infringement case.

## II.   ARGUMENT

TPI was not obligated to use means-plus-function language in its claims.  But it did, and now those claims are limited to the corresponding structure and algorithm disclosed in the specification.  *See, e.g., Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).  If there is no algorithm disclosed in the specification for performing the recited functions, as is true for many of the means-plus-function elements, those claims are indefinite and invalid.  *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009).

TPI attempts in its opening brief to relieve itself of the statutory consequences of its means-plus-function claiming by complaining that some of Facebook's constructions refer directly to specific column and line numbers of the '216 specification.  But Federal Circuit law is clear that those terms must be construed by reference to the specific algorithm disclosed in the specification.  *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999).  As such, courts routinely construe means-plus-function elements by citing the column and line numbers in which the algorithms are disclosed.[1]  *See, e.g., Individual Network, LLC v. Apple, Inc.*, 2009 WL 81795, at *8 (E.D. Tex. 2009) (citing cases) ("In accordance with *WMS Gaming*, reference to the patent specification to identify specific algorithms the computer is

---

[1] For some of the disputed means-plus-function claim elements, the algorithms disclosed in the specification were sufficiently straightforward that Facebook provided a narrative recitation of the algorithms instead of a citation to the specification.  *See, e.g.*, Facebook Op. Br. at 26-28. For other claim elements, the algorithms disclosed in the specification were complex and would have required extensive context to accurately paraphrase, so Facebook instead relies on citation to the precise column and line numbers in which the algorithms appear.

programmed to perform may be done with explicit reference to text or figures in the specification, by reference to column and line numbers, or by identification of alternative algorithms disclosed in the specification.") (emphasis added).  TPI cites no authority, nor can it, for its suggestion that it is improper to rely on straightforward citations to the specification.[2]

TPI also complains that Facebook's direct references to the specification may not be comprehensible to a lay jury, but TPI does not explain why these references to its own specification would be incomprehensible.   Nevertheless, TPI's argument misses the point— means-plus-function claim elements are "statutorily limited" to the corresponding structure and algorithm in the specification.  *See Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).  TPI cannot evade that statutory limitation by merely speculating that its specification might be challenging for a lay jury to understand.  TPI's approach also ignores that "[i]t is the person of ordinary skill in the field of the invention through whose eyes the claims are construed," *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998), not a lay jury.[3]

TPI's proposals for the non-means-plus-function elements also violate the principles established in *Phillips* requiring support in the intrinsic record, and as such must be rejected.

## A.    Terms Regarding "Security Attributes" / "Security Parameters"

### 1.    "security attributes" / "security parameters"

On October 20, 2010, TPI finally provided its court-ordered construction of "security attributes" and "security parameters."[4]  Those were the constructions Facebook addressed in its

---

[2] In fact, TPI relied on this exact method of identifying corresponding structure in response to the Court's order when it argued that: "*TPI identified in the most straight-forward way possible— citation to column and line from the specification—the structure necessary to perform each of the claimed functions in accordance with the Court's Order*."   (*See* D.I. 123 at 7 (emphasis added).)  It is difficult to comprehend how TPI can fault Facebook for using what TPI called "the most straight-forward way possible" to identify corresponding structure.

[3] As in any patent case, expert testimony can provide further explanation to the jury to help it understand the disclosed algorithms as applied to the prior art and the accused products.

[4] TPI's complaints that Facebook changed its constructions for certain terms is unsupported by the record.  TPI, for its part, first provided its constructions for many of the proposed terms approximately two weeks before the deadline for opening briefs.  (*See* Repicky Decl. Ex. 9 (D.I.

opening brief and which Facebook itself adopted (minus the unsupported inclusion of "user IDs"). (*See* Repicky Decl. Ex. 9 (D.I. 194-10) at 6.)  In a last-minute change, TPI has seemingly abandoned its court-ordered constructions and now argues that these terms require no construction. (TPI Open. Br. at 40.)  TPI's new position is contradicted by its own statements in reexamination, in the specification, and in the original prosecution history.

TPI cannot now run away from the unmistakable statement it made to the PTO during reexamination in which it defined "a security attribute [as] consisting of the name of the page creating remote user wishing to give permission and the remote user to whom the permission is given." ("Pivovar Decl." (D.I. 196) Ex. F at 14.)  "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Industries, L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).  This definitional statement mirrors the specification's description of "a permission attribute, consisting of the name of the remote user . . . wishing to give permission and the user to whom permission is given." (Col. 10:23-25.)  TPI's brief repeatedly admits that this "permission attribute" is the claimed security attribute or security parameter. (TPI Open. Br. at 14-15.)  Therefore, the proper construction of these terms is the one Facebook has proposed, which was derived from TPI's statements to the PTO and recited in the '216 specification.

The original prosecution history further supports this definition.  In order to gain allowance of its claims, TPI distinguished its more specific "security parameters" from general "passwords." (*See* Pivovar Decl. Ex. C at 5 ("These disclosed means for allowing the page-creating remote user to input security parameters are different from passwords.").)  TPI's new proposal that these terms be defined solely by the surrounding claim language must be rejected because it could recapture password implementations distinguished in the original prosecution.

---

194-10).)  Facebook was under no obligation to disclose its claim constructions before TPI's constructions, or before filing opening briefs.  Facebook's refinements of its claim constructions were responsive to TPI's belatedly-served constructions and were provided to TPI sufficiently in advance to allow TPI to address them in its opening brief.

Finally, TPI's argument that Facebook's construction is wrong for not including "user IDs" is without merit.   (TPI Op. Br. at 11.)  TPI did not include "user IDs" in its definitional statement to the PTO because there is no reference to "user IDs" in the portion of the specification discussing security attributes.  (*See* Pivovar Decl. Ex. F at 14.)  TPI's reliance on the parenthetical "(USER ID 202)" is wrong.  As Facebook's opening brief explained, this is just a label for the column heading of the table in Figure 5, not a part of the security attribute.[5]  (*See* Facebook Op. Br. at 11-12.)  TPI's attempt to avoid its own construction to the PTO should therefore be rejected.

### 2.    "means for the page-creating remote user to enter security parameters" (claim elements 1(f), 10(e), 16(f), 21(e), 29(e), 32(e))

TPI's brief never identifies the functions for these six means-plus-function elements.  TPI cannot dispute that the function recited in these elements requires the page-creating remote user to enter or input the "security parameters."  (S*ee* Facebook Op. Br. at 5-6, Appendix A(section A).)  As there is no corresponding structure disclosed in the specification for this function, these terms are indefinite and the claims invalid.

### a.    TPI Cannot Identify Corresponding Structure.

The specification, and even TPI's proposed construction and arguments, make clear that the system creates the claimed security attributes.  During reexamination, TPI conceded that the specification does not disclose any corresponding structure in which the user enters or inputs the security attributes.  Rather, TPI explained that *the security attributes are created by the system.* (Pivovar Decl. Ex. F at 14.)  TPI reiterates this position in its opening brief.  (TPI's Op. Br. at 22 ("the invention . . . create[s] the security attributes of the claims").)  But the creation and storage of a security attribute by the system is not the function recited in the claims.  The claims require

---

[5] TPI's attempt to selectively include "user IDs" within the scope of this term is further undermined by its failure to allege the inclusion of "viewer IDs" as there is also a parenthetical label "(VIEWER ID 204)."  (Col. 10:25.).  TPI's failure to mention "(VIEWER ID 204)" further demonstrates its recognition that the column headings are not part of the "permission attribute."

the user to enter it.  As the specification discloses no algorithm to perform this function, these claims are indefinite and therefore invalid.  *See Blackboard, Inc*, 574 F.3d at 1384.

That indefiniteness is further confirmed by the defects in TPI's proposed construction which attempt to add the function of "storing" into this element.  A court may not import structural limitations from the specification that are unnecessary to perform the claimed function. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001); *Axcelis Tech., Inc. v. Applied Materials, Inc.*, No. Civ. A. 01-10029-DPW, 2003 WL 21361339, at *2 (D. Mass. June 12, 2003) (Woodlock, J.) ("Structural features that do not actually perform the recited function do not constitute corresponding structure").  TPI proposes a corresponding structure that "prompts a page-creating remote user for the name or user ID of another remote user," and then "executes a program that passes that name or user ID to a database <u>for storage</u> along with the name or user ID of the page-creating remote user."  (TPI Op. Br. at 7-8 (emphasis added).)  But TPI has already admitted to the PTO that "[t]he storing of the attribute or parameter *is not included in these means as there are separate claims/claim elements that push the entered attribute into the database*."  (Pivovar Decl. Ex. F at 14 (emphasis added).)  TPI has therefore confirmed that "storing" cannot be part of the function of these elements.

TPI's arguments for the separately claimed "means for storing the security parameters" element of claim 32(f) further demonstrate that "storing" does not properly belong with the security parameter entry elements as TPI has proposed.  TPI cites the same specification excerpt for the security parameter input means and the separate "means for storing the security parameters" element of claim 32(f).  (*Compare* TPI's Open Br. 8-9 with 14-15 ("the portion of the specification for corresponding structure" of the "means for storing" is col. 10:22-28).)  Because the function—i.e., the verb— recited in that portion of the specification is "storing," TPI's attempt to incorporate storage should be rejected.  *See Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1216-20 (Fed. Cir. 2003) ("we have rejected similar attempts to include as additional corresponding structure for a particular function a structure that is disclosed in the specification but is not associated with the particular claimed

function"); *Cardiac Pacemakers Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1115 (Fed. Cir. 2002) (rejecting a construction that would render claim language meaningless and stating that any such "construction is therefore improper; this court will not rewrite claims").   Because the specification does not disclose an algorithm for a <u>user</u> to input the security parameters, these computer-implemented means-plus-function elements are indefinite.

### b.   TPI Is Bound by the Construction It Argued to the PTO.

TPI suggests that it should not be bound by the construction it advanced to the PTO to try to preserve its claims.  (*See* TPI's Op. Br. at 10-11.)  But TPI made those admissions during this litigation, with full understanding of their significance and how they would be used to interpret the claims in this proceeding.  TPI's wish that it had not made those admissions does not give it license to ignore them.  If the Court deems construction for this element possible, TPI should be held to the construction it provided to the PTO.[6]  (*See* Facebook's Op. Br. at 9-11.)

### 3.   "means for storing the security parameters" (32(f))

TPI does not identify a function for this element, but apparently does not disagree with Facebook's identification.   TPI's structure must be rejected because it departs from the specification, which plainly recites that the corresponding structure is "a CGI program executing on a CGI processor 92," which stores the information in database 96 (*see* col. 10:26-28).   The specification does not support TPI's proposal that a "Web server" executes some phantom "program" to "pass attributes" to one or more undefined databases.   "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function."  *Default Proof Credit Card Sys., Inc. v. Home Depot, Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (citation omitted).   A proper construction must therefore include database 96 and CGI processor 92 as they are necessary for

---

[6] TPI also complains that it is improper for Facebook to exclude "user ID" from the construction, even though that term was mistakenly interjected into TPI's construction to the PTO.  But, as demonstrated in the previous section, TPI's reference to a "user ID" in its construction is not even supported by the portion of the specification that TPI cites, which recites only that "the remote user may be <u>prompted for the name of the user</u>."  (Col. 10:23-25 (emphasis added).)

actually storing the security parameters.   Because TPI's construction ignores both of the structures that are necessary to actually perform this function, it should be rejected.

### B.      Terms Regarding "Displaying"

#### 1.      "displaying"

TPI provides no evidence that one of ordinary skill in the art would interpret this term under anything other than its commonly understood meaning.   Therefore, "displaying," i.e. "visually presenting"—both logically and as taught by the specification—occurs on a user's "display."  (Facebook's Open. Br. at 25.)  TPI's attempt to rewrite the term to become an act that occurs only on the server (apparently to avoid divided infringement issues)  must be rejected.

#### 2.      "means for displaying the personal page" (16(g))

Though TPI generally cites the same portion of the specification that Facebook identifies, TPI omits the structure and algorithms disclosed therein that actually perform the claimed function.  CGI Processor 92 and Display 308 are necessary to display the page to the remote user.  (*See* Facebook Open Br. at 13-14.)   The specification states that "a CGI program is executed on server 86 (FIG. 2) to display the personal page to the remote user," (col. 11:7-8), and that the computer system "also includes a display 308" (col. 11:44).   Just as a literal "printed" page cannot be displayed without the paper onto which it is printed, the specification teaches that the system "prints" the personal page for displaying on the remote user's computer screen.  (*See* col. 11:19-21.)

TPI's proposed construction also omits the step-by-step process disclosed in the specification by which the CGI program retrieves the information used "to display the personal page."  (*See* Facebook's Open. Br. at 14.)   TPI does not attempt to justify omission of the algorithm steps disclosed at lines 8-18 of column 11.   TPI instead summarily states that a program "assembles the attributes," (TPI Open Br. at 15), but a program cannot "assemble" what it has not retrieved, and without retrieving the information about the organization of the personal page, including the selected template, it cannot display it.  (*See* col. 11:8-18.)

TPI also argues that additional limitations must be included as corresponding structure to address the functional limitation of displaying "only to authorized remote users." If such additional limitations are deemed necessary, then they must include the disclosed algorithm at 10:62-11:3, details of which TPI's proposal wrongly omits.

**C.    "(provide a page-creating remote user with) means to create a personal page having personal information" (29(b))/"means for creating a personal page having personal information for a page-creating remote user" (32(b))**

TPI's construction does not perform the claimed function of "creating" a personal page, and therefore must be rejected. TPI's arguments mistakenly focus on the "personal information" limitation, and in so doing, wrongly exclude the selection of a template because "the template is not personal information." (*See* TPI Open Br. at 14.) That is not the proper inquiry. The proper inquiry is whether the selection of a template is necessary for *creating* a personal page. As Facebook's opening brief demonstrates, template selection is essential to page creation. (*See* Facebook's Open. Br. at 17-20.) Without first selecting a template there can be no page creation.

TPI argues that it can exclude template selection because the language in the specification is permissive. But this is legally incorrect. Permissive language does not prevent a court from construing a means-plus-function claim element to cover a structure if that structure is needed to perform the claimed function. *See, e.g., Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356 (Fed. Cir. 1999) ("Although patentees are not necessarily limited to their preferred embodiment . . . interpretation of a means-plus-function element requires this court to consult the structure disclosed in the specification, which often, as in this case, describes little more than the preferred embodiment.") (citation omitted). The only case TPI cites, *i4i Limited Partnership v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), is inapposite because it does not involve means-plus-function claims. Moreover, TPI ignores the fact that the portion of the specification it cites refers to both "creating" and "editing" a personal page. (*See* col. 8:42.) A template is always required to create a personal page. (*See* Facebook's Open. Br. at 17-20, 21-23.) The permissive language must be read in the context of "editing" the personal page (an optional subsequent step), which takes place *after* the user has already selected the template necessary for creating the

personal page.  TPI even admitted this in describing the system to the PTO: "a page-creating remote user of a computer network *creates a personal page by selecting a template and contributing text and graphics.*"  (Pivovar Decl. Ex. B at 10 (emphasis added).)   TPI's construction therefore cannot be adopted.

### D.     Terms Regarding "Prompting" With A Plurality of "Page Templates"

#### 1.     "page"

TPI argues that "page" means "a Web page," but this is not warranted by the specification.  TPI overlooks that the "World Wide Web pages" it cites from the Background section relate to prior art Web pages that the patent criticizes.  (Col. 1:53-2:11; Pivovar Decl. Ex. B at 7.)  The term "page" is not limited to the web, and the term is clear by itself.

#### 2.     "page template"

TPI's piecemeal approach results in a confusingly redundant construction that ignores the intrinsic evidence.  A "page template" is not simply a "template," but the specific template used to create and display a private personal page that must include fields for the user to enter personal information.  (*See* Facebook's Open. Br. at 20-21.)

#### 3.     "prompting (a remote user)"

"Prompting" has a precise meaning in the art that must be performed by a computer, not a person—a distinction TPI's proposal fails to acknowledge.  A computer has no way of detecting if a "prompt" (or "urge" as TPI contends) has garnered a response until the person affirmatively conveys the responsive to the computer.  The "prompting" of the claims therefore requires a user response, not simply "urging" one, as TPI suggests.  (*See* Facebook's Open. Br. at 32-33.)

#### 4.     "providing/prompting ... with a plurality of page templates"

TPI's construction fails because of the flaws in its constructions of the components of this phrase, and because it does not acknowledge that the step of providing/prompting the user with a plurality of page templates must precede the other steps of page creation.  TPI cannot identify anything in the specification that teaches page creation, including text and graphics selection, in

the absence of a previously-selected page template.  The Court should thus clarify that this step precedes the other steps of page creation.  (*See* Facebook's Open. Br. at 21-23, 33-34.)

> ### 5.     "means for providing a page-creating remote user with a plurality of templates for selection for the personal page" (claim element 16(b))

TPI's construction merely repeats the definition of "template" to try to create an illusion of an algorithm where none is disclosed.  (TPI's Op. Br. at 26.)  Excising the redundant language reduces TPI's proposal to "a web page that presents a plurality of templates for selection by the page creating remote user for display on his or her personal page," which merely repeats the claimed function without an algorithm for performing it.  TPI's inability to identify an algorithm further confirms that these terms are indefinite.  *E.g.*, *Finisar*, 523 F.3d at 1340.

## E.     Claim Terms Regarding "Attributes"

### 1.     "attributes"

The specification refers to "attributes" in various contexts throughout the specification. (Facebook's Open. Br. at 31-32.)  TPI's construction improperly crops and distorts one of these references to "attributes" from the "Summary of the Invention."  (TPI Open. Br. at 34.)  Because TPI's proposal ignores the other uses of "attributes," it should be rejected.[7]

> ### 2.     "means for storing attributes representing the personal information in the page-creating remote user's personal page in one or more databases" (32(c))

As Facebook's opening brief demonstrated, the correct structure and algorithm that is clearly linked to the claimed function is located at column 10, lines 10-14.  (*See* Facebook's Open. Br. at 23-24.)  TPI's construction is based on the false assumption that a "Web server" can perform the claimed function without a database or the CGI programs that the Web server uses to access and store information.  This is directly contradicted by the specification, which plainly discloses that the attributes are stored "in the database 96," (col. 10:10-11), and that the CGI

---

[7] The Court should also make clear that the unmodified term "attributes" is distinct from the "security attributes" (and "security parameters") that the Court is being asked to separately construe.  The claims treat these limitations differently, and the security attribute/parameter terms were the subject of special attention in the prosecution history of the '216 patent and the reexamination, resulting in specific disavowals and disclaimers applicable to those terms.

programs 92 access that database.  (Col. 6:55-7:4.)  The Web Server cannot perform the claimed storing function without database 96 and CGI programs/processor 92.[8]  TPI's incomplete construction must therefore be rejected.

**F.      "means for the page-creating remote user to include a voice greeting in the personal page" (claim 27)**

The portion of the specification cited by TPI is not "clearly linked" to the claimed function as required by Federal Circuit law.  *See Default Proof*, 412 F.3d at 1298.  The Audio Text System (ATS) machines disclosed in the specification record audio data by receiving telephone calls from users—not via a web page.  (*See* col. 4:45-49.)  Nothing in the specification links (let alone clearly links) these ATS machines to the claimed function.  (*See* Greenberg Decl. ¶ 28.)  As such, there is no basis for TPI's proposal.

**G.      Claim Terms Regarding "Profile Information"**

**1.      "profile information"**

Despite TPI's argument, "profile information" has no plain and ordinary meaning.  Facebook's construction is derived from the only sentence in the specification that mentions profile information.  (Col. 7:13-16.)  TPI notes that this sentence begins by stating that the "PON *may* include," (TPI's Open. Br. at 32), but the word "may" does not modify the "profile information," it modifies the Personals On-Line Network (PON).  The profile information is defined later in that sentence, and Facebook's construction properly adopts that definition.

**2.      "accessing (by a remote user)"**

The term "accessing" is used only in claim 10[9] in the context of "accessing the profile information."  TPI's attempt to rewrite "accessing" as "viewing" is based on an inapplicable excerpt from the specification which refers to access to a "personal page" and not "profile

---

[8] TPI's own construction and arguments admit that the Web Server "stores that attributes in one or more databases."  (TPI's Open Br. at 12.)  In the context of the specification, the databases to which TPI refers are database 96.  Thus, even TPI's own arguments demonstrate these are necessary structures for performing the claimed function.

[9] Other claims of the '216 patent refer to "access the profile information" (*e.g.*, claim element 16(e), which likewise do not justify being rewritten as "view the profile information."

information." (TPI's Open. Br. at 35-36.)  TPI's reliance on this passage is puzzling given its repeated arguments that "profile information" is different from the "personal page." (*Id.* at 30-31.)  One of ordinary skill in the art would understand "access" as consistent with its customary meaning in computer science: "gain entry to memory in order to read or write data." (*See* Pivovar Reply Decl. Ex. J at 12.)  There is no justification to deviate from that meaning.

### 3. "profile information . . . accessible to other remote users"

There is no basis in the intrinsic evidence for construing "profile information . . . accessible to other remote users" as "information that can be viewed," as TPI proposes.  The claims recite that the "profile information" is "accessible" and the specification teaches only that the "profile information" can be searched. (*See* col. 7:16-18.)  There is no mention anywhere in the specification of "viewing" the profile information itself. (*See* Facebook's Open. Br. at 31.)

TPI's "viewing" limitation would also contradict what is taught in the specification.  A user's date of birth (e.g., June 16, 1986) could be information on a user's personal page that cannot be publicly viewed.  But that same information could serve as "profile information . . . accessible to other remote users" when a search is performed for users based on age (e.g., the date of birth will be "accessed" and deemed a "match" if a search is run for someone between 20-25 years of age).  In this example, the user's date of birth would not be viewable because it is part of the personal page, but it would still be "accessible" as "profile information." (*See* Fig. 4A (depicting "profile" information on the private personal page).)  TPI's construction would exclude this embodiment and should therefore be rejected.

### 4. Means-Plus-Function Elements for Accessing Profile Information and Selecting Other Remote Users (claim elements 10(d), 16(e), 23, 24, 29(d), 32(d); dependent claims 31 and 34)

TPI makes the unsupported and irrelevant statement that "one of ordinary skill in the art would understand how to program the system to store profile information and retrieve that information for viewing by a remote user." (TPI's Open. Br. at 24.)  Federal Circuit law is clear that a patentee cannot use the purported knowledge of one of ordinary skill in the art as a substitute for the structure and algorithm that must be disclosed in the specification itself. *E.g.*,

*Blackboard, Inc.*, 574 F.3d at 1385 ("A patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function.").  Because the specification discloses no structure or algorithm for performing the function of these claim elements, they are indefinite.[10]

### 5. "means for storing profile information relating to each remote user" (elements 16(a) and 32(a))

TPI has identified no algorithm in the specification that performs the claimed function of storing profile information.  TPI cites to general descriptions of the system (col. 6:16-7:8) and the "exemplary database tables" that "store a variety of information relating to the users of the system" (col. 7:31-34 and Fig. 3).  But neither the generic technical description of the system nor the various database tables TPI relies on ever once mention the "profile information" that must be stored by these claim elements.  The portions of the specification cited by TPI relate to the storage of information for a *personal page*, and are not "clearly linked" to the function of storing *profile information*.  They therefore cannot provide the corresponding structure for these means-plus-function elements.  *See Default Proof Credit Card System, Inc.*, 412 F.3d at 1298.  The only mention of "profile information" in the specification provides no description of how that information is stored.  (Facebook's Open. Br. at 29.)  There is nothing in the specification that supports TPI's construction because these claim elements are indefinite.

### H. "means for contributing text" (elements 10(b) and 16(c))

TPI and Facebook cite to the same portion of the specification to identify the algorithm that performs the function of contributing text to the personal page (col. 9:31-43), but TPI improperly omits the fact that the algorithm requires the system to behave differently "[d]epending upon the template selected."  (Col. 9:40-43; Facebook's Open. Br. at 26-27.)  TPI asserts that "claims 10 and 16 separately recite features relating to template selection," but this argument reflects a misunderstanding of Facebook's construction.  (*See* TPI's Open. Br. at 17.)

---

[10] In fact, six of TPI's seven paragraphs for its "definiteness" arguments of these elements do not even cite to the specification.  (*See* TPI Open. Br. at 23-24.)

Facebook's construction does not require the "means to contribute text" to perform the step of template selection—it specifies how template selection (which has already occurred) determines how text is contributed. This is part-and-parcel of the algorithm disclosed in the specification. TPI's reliance on "permissive" language in the specification to support its position is contrary to Federal Circuit law regarding the construction of means-plus-function terms, as explained above. *See Signtech*, *supra*, 174 F.3d at 1356. TPI's arguments therefore cannot be adopted.

**I.      "means for contributing graphics" (elements 10(c) and 16(d); claim 33)**

TPI wrongly excludes details of the algorithm related to "background graphics" and how the entry of graphics is governed by the selected page template. (*See* Facebook's Open Br. at 27-28.) And while TPI admits that "implementation details" of the algorithm for these elements include "[d]epending on the template selected, the remote user may be presented with more than one opportunity to select or upload an image" (TPI's Open. Br. at 18; col. 9:28-30), it nevertheless excludes these details of the algorithm from its construction. This is improper.

TPI's argument that "[u]ploading more than one image is merely an optional feature of the disclosed system—not a required one" is irrelevant because nothing in Facebook's construction requires a user to upload more than one image. Facebook's construction incorporates the verbatim teaching from the specification that "[d]epending on the template selected, the remote user may be presented with more than one opportunity to select or upload an image." (Col. 9:28-30.) This is a necessary component of the disclosed algorithm.

**J.      Terms Regarding "Users"**

**1.      "remote user"**

TPI's construction of "remote user" as "a person who is able to use a claimed system or method over a computer network," may as well read: "a person who infringes a patent," which cannot meaningfully be applied to prior art or any accused system. The claimed "remote user" is a specific type of "user" of the system—one who is able to create or view a personal page. (Facebook's Open. Br. at 29-30.) TPI's non-construction should be rejected.

### 2. "page-creating remote user"

The specification references a "page-creating remote user" in connection with *creating* a personal page. (*See* col. 7:24-29, 8:36.) The other parts of the specification cited by TPI only refer only to a "remote user." (*See* col. 9:9-43.) This contrast between a "remote user" and a "page-creating remote user" indicates that a "remote user" can both create and/or edit a personal page while the "page-creating remote user" is – as its plain language indicates – creating one. (*See* col. 8:34-9:63.) TPI's construction should therefore be rejected.

### K. "authorization/authorized/authorizing"

TPI has not demonstrated that these terms should be left without any construction. These terms have a special meaning within the patent and within in the art that is not reflected by their so-called ordinary meaning. (Facebook's Open. Br. at 34-35; Pivovar Reply Decl. Ex. K at 220 (authorization "specifies whether the current user has permission to enter a secure area").)

### L. CGI Processor 92 and Other Structures Are Necessary For Performing Claimed Functions.

TPI seeks a blanket exclusion of various structures from any construction of any means-plus-function claim element. (TPI Open Br. at 18-21.) TPI premises this argument on the false assertion that "each of the means-plus-function elements is a Web page or series of Web pages programmed according to the algorithms disclosed in the specification." (*Id.* at 18.) TPI's own constructions confirm the falsity of this assertion, as TPI itself identifies a "Web server" as corresponding structure for several means-plus-function elements. (*See. e.g.*, *id.* at 14 ("means for storing security parameters"), 12 ("means for storing attributes"), ("means for storing profile information").) As explained above, the corresponding structure for these claim elements plainly includes CGI programs/processor 92 and database 96. There is no basis for a blanket exclusion of CGI processor 92 as a corresponding structure for the claims. Nor is there a basis for excluding display 308, a necessary structure for the "means for displaying" as explained above.

## III. CONCLUSION

Facebook respectfully requests that the Court adopt Facebook's positions.

Dated:  November 30, 2010                  By: ____*/s/ Adam M. Pivovar*_____
                                                      Adam M. Pivovar

                                           Heidi L. Keefe (pro hac vice)
                                                hkeefe@cooley.com
                                           Mark R. Weinstein (pro hac vice)
                                                mweinstein@cooley.com
                                           Reuben H. Chen (pro hac vice)
                                                rchen@cooley.com
                                           Adam M. Pivovar (pro hac vice)
                                                 apivovar@cooley.com
                                           Daniel J. Knauss (pro hac vice)
                                                dknauss@cooley.com
                                           COOLEY LLP
                                           3175 Hanover Street
                                           Palo Alto, CA 94304-1130
                                           Telephone: (650) 843-5000
                                           Facsimile: (650) 857-0663

                                           OF COUNSEL :
                                           Donald K. Stern (BBO No. 479420)
                                                dstern@cooley.com
                                           COOLEY LLP
                                           500 Boylston Street
                                           Boston, MA 02116
                                           Telephone: (617) 937-2300
                                           Facsimile: (617) 937-2400

## <u>CERTIFICATE OF SERVICE</u>

I, Adam Pivovar, hereby certify that pursuant to Local Rule 5.4(C), this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  For those parties indicated as non-registered participants a paper copy will be sent by facsimile and/or U.S. First Class Mail on November 30, 2010.

<i>/s/ Adam Pivovar</i>
Adam M. Pivovar

900360 v18/HN