UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TELE-PUBLISHING, INC.,          )
                                )
          Plaintiff,            )     CIVIL ACTION NO.
                                )     09-11686-DPW
          v.                    )
                                )
FACEBOOK, INC. and              )
THEFACEBOOK, LLC,               )
                                )
          Defendants.           )
                                )

MEMORANDUM AND ORDER
September 7, 2016

Plaintiff Tele-Publishing, Inc. ("TPI") brought this action against Defendants Facebook, Inc. and TheFacebook, LLC, (collectively, "Facebook") alleging infringement of United States Patent No. 6,253,216 (the "'216 Patent"). The '216 Patent describes methods (claims 1 and 10), systems (claims 16 and 32), and computer code (claims 21 and 29) for providing "users with a secure way to display personal information to other computer network users" via a personal page. '216 Patent, col. 1 ll. 14-18. Facebook responded to TPI's claim with a counterclaim seeking a declaratory judgment of non-infringement of the '216 Patent and of invalidity and/or unenforceability of the '216 Patent.

Following discovery, the parties submitted briefing on the construction of claim terms of the '216 Patent. While claim

construction was pending, the United States Patent and Trademark Office ("PTO") Examiner rejected the '216 Patent, and TPI appealed to the Board of Patent Appeals and Interferences ("BPAI"). And while that appeal was pending, I held an initial claim construction hearing. The BPAI subsequently reversed the PTO Examiner and reinstated the '216 Patent, and the parties filed supplemental claim construction briefs concerning intrinsic evidence arising from the BPAI appeal process.

## I. BACKGROUND

### A. *The '216 Patent*

The PTO issued the '216 Patent, entitled "Method and Apparatus for Providing a Personal Page," to TPI on June 26, 2001. The application was filed on June 3, 1997, and the final patent includes Claims 1 through 34, of which Claims 1, 10, 16, 21, 29, and 32 are dependent, and the remaining are independent. '216 Patent col. 12 l. 48-col. 16 l. 49.

The specification, in the Background of the Invention section, explains that "systems for providing personals advertisements on networked computers" began to appear at the "advent of the Internet's World Wide Web." *Id.* at col 1 ll. 30-32. Initially, these advertisements merely provided the same information previously available in personals advertisements published in newspapers. *Id.* at col. 1 ll. 36-38. Such systems

2

did not take full advantage of the capabilities of computer systems and networks, including the use of images and graphics, the ability for people to communicate over computer networks, and the ability to restrict access to particular users. *Id.* at col. 1 ll. 40-48.  The invention aims to supply these services, and is a "system for generating a page for display on a computer system accessible to a plurality of remote users through a computer network," *id.* at col. 2 ll. 22-25, which includes

> means for displaying at a user site at least one template, means for inputting user-data to be included in a predetermined area of the template, means for storing the user-data in a predetermined field of a database and means for retrieving the user-data from
>
> the database and for displaying the template and the user-data on a display of the computer system.

*Id.* at col. 2 ll. 25-31.

An embodiment of the invention described in the specification uses the system to provide users with a personals page for use on a Personals On-line Network.  *Id.* at col. 2 ll. 31-33.  This system allows users to create a page by selecting a template and contributing text and graphics to the page and provides the user the ability to authorize other uses to view the personal page.  *Id.* at col. 2 ll. 40-44.  The system stores data provided by the user and displays the information on request by other users.  *Id.* at col. 2 ll. 44-53.

Since the patent was issued, the landscape of "social networking" sites, broadly speaking, has changed dramatically. Major players have entered the space, expanded, and closed or been bought out by other companies.  Some examples include Friendster, which was founded in 2002 and at one point had over 115 million registered users, and MySpace, which was developed in 2003 and had 100 million active users.  Most notably, Facebook, which was founded in 2004, has become a publicly traded company in 2012 and supports over 1.65 million monthly active users.  In addition, the total number of social networking sites, most of which were developed after TPI filed for the '216 Patent, has exploded.  The rapid development in the field over the last decade calls necessitates particular care in construing the terms as they would have been understood by one skilled in the art at the time of filing, and not as they may be understood today.

**B.    *Procedural Background***

TPI's original complaint in this action was filed on October 7, 2009.  On December 22, 2009, Facebook filed a request for *ex parte* reexamination of the '216 Patent with the PTO. Thereafter, this dispute has traveled along parallel tracks in this Court and at the PTO.  To provide a complete history of the

dispute to date, I briefly summarize the proceedings before the PTO.

Facebook's reexamination request raised questions of patentability based on the existence of alleged prior art not cited in the original prosecution of the '216 Patent. On April 16, 2010, the PTO issued an office action rejecting all thirty-four claims of the '216 Patent. TPI responded to the office action on June 16, and the PTO ultimately issued a Final Rejection of all claims in the '216 Patent on August 20, 2010.

In the initial office action, the PTO rejected all claims in the '216 Patent based in large part on the existence of the alleged prior art, namely United States Patent No. 5,796,395 (the "de Hond Patent"). In its final action, the PTO rejected the contention by TPI (shared by Facebook) that critical elements at issue are "means-plus-function" elements governed by 35 U.S.C. § 112, ¶ 6. [1]

TPI filed a response to the final office action on October 20, 2010. On November 5, 2010, the PTO issued an advisory action which affirmed its rejection of all claims. TPI then

---

[1] I note that the Act of September 16, 2011, Pub.L. 112-29, § 4(e), 125 Stat. 297 prospectively renumbered § 112. Because this litigation began in 2009, I will use the prior numbering system in this Memorandum.

appealed the PTO decision to the Board of Patent Appeals and Interferences ("BPAI").

On February 23, 2012, the BPAI reversed the PTO's decision. The BPAI found that claims 1, 10, 16, and 21 of the '216 Patent were not anticipated by de Hond because de Hond did not recite the use of a plurality of page templates.  It also found that claims 29 and 32 were not anticipated by de Hond because de Hond did not authorize remote users to access the profile information and a personal page differently, as provided by claims 29 and 32.  Thus, the BPAI concluded that the PTO Examiner erred in finding that claims 1-26 and 28-34 were anticipated by de Hond under 35 U.S.C. § 102(e).  The BPAI's decision did not address whether the patent requires means-plus-function analysis under 35 U.S.C. § 112 ¶ 6.

## II. LEGAL BACKGROUND

A patent must include "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112 ¶ 2. It is firmly established "that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc.* v. *Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

6

Construing the terms of a patent, "including terms of art within its claim, is exclusively within the province of the court." *Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). *See generally*, *Teva Pharmaceuticals USA, Inc.* v. *Sandoz, Inc.*, 135 S. Ct. 831 (2015); *Eon Corp. IP Holdings, LLC* v. *Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318-21 (Fed. Cir. 2016).

**A.   *Claim Construction***

When construing the terms in a claim, the words "'are generally given their ordinary and customary meaning,'" *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)), that is, the meaning that "a person of ordinary skill in the art in question at the time of the invention" would give to the term, read "in the context of the entire patent, including the specification." *Id.* at 1313.

In addition to the claims and the specification, courts consider the prosecution history of the patent, which is the record of the proceedings before the PTO which resulted in the grant of the patent.  *Id.* at 1317.  While the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor

7

limited the invention in the course of prosecution." *Id.*

Courts may also consider "extrinsic evidence," which is that evidence outside of the patent and prosecution history, including testimony, general and technical dictionaries, and treatises. *Id.* Although "extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand the claim terms to mean," *id.* at 1319, it is "less reliable than the patent and its prosecution history," *id.* at 1318, and "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

**B.   *Means-Plus-Function Analysis***

Several of the disputed claim elements are alleged to be "means-plus-function" elements implicating ¶ 6 of 35 U.S.C. § 112, which provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

In other words, a claim that recites a "means for" performing a function does not have to state a specific structure for carrying out that function in the claim, so long

as it is described in the specification.  See *generally, Media Rights Technologies* v. *Capital One Financial*, 800 F.3d 1366, 1371-74 (Fed. Cir. 2015); *Williamson v. Citrix Online, Inc.*, 792 F.3d 1339 , 1347-49 (Fed. Cir. 2015).  As a result, "[i]n construing a means-plus-function claim, the district court must first determine the claimed function and then identify the corresponding structure in the written description of the patent that performs that function."  *Baran* v. *Med. Device Techs, Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).  The scope of the claim language is of particular concern in identifying the function of a means-plus-function claim.  For district courts construing disputed claim terms in a patent, the Federal Circuit has warned against limiting a claimed function beyond the scope of the claim language, or broadening it by ignoring limitations contained in the claim language.  *Lockheed Martin Corp.* v. *Space Systems/Loral,Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).

When "means-plus-function" analysis involves claim elements implemented by computers and microprocessors, the Federal Circuit has required that a specific algorithm for such implementation be disclosed.  *WMS Gaming, Inc.* v. *Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).  A patentee must "disclose the algorithm that transforms the general purpose microprocessor [or computer] to a 'special purpose computer

programmed'" to undertake the specified function.  *Aristocrat Techs. Austl. Pty Ltd.* v. *Int'l Gaming Tech.*, 521 F.3d 1328, 1338 (Fed. Cir. 2008) (citation omitted).

The algorithm structure need not be extensive. "[A]lgorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." *AllVoice Computing PLC* v. *Nuance Commc'n, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007).  Though it need not be extensive, it nevertheless must actually be described in the specification.  Relying merely on a showing that "one of ordinary skill in the art could *build* the device claimed . . . based on the disclosure in the specification . . . conflates the requirement of enablement . . . and the requirement to disclose the structure that performs the claimed function . . . ."  *Aristocrat*, 521 F.3d at 1336 (emphasis added).  The specification must "recite the particular structure," *id.*, and "if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim," then the means-plus-function claim is indefinite and thus invalid.  *AllVoice*, 504 F.3d at 1241.

### III. CLAIM CONSTRUCTION

The parties dispute twenty-six claim terms which appear in various of the claims, including the six independent claims. Most of the claim terms are considered separately, but I have consolidated the analysis of several to avoid repetition.

**A.   *"Security Parameters" or "Security Attributes" "Entering" or "Inputting" Means***

Each of the six independent claims includes an element describing means for the page-creating remote-user to enter or input security parameters or attributes granting permission to others to view the personal page.  '216 Patent Claims 1(f), 10(e), 16(f), 21(e), 29(e), 32(e).  The parties agree these are "means-plus-function" elements subject to 35 U.S.C. § 112 ¶ 6, and they agree that all elements should have identical constructions.  These six claim elements are similarly worded, but are not identical.[2]  The claims are as follows:

> 1.  A method for providing a personal page . . ., comprising of the steps of . . . **(f)** providing the page-creating remote user with means to input security parameters for the personal page, the security parameters specifying authorization of at least one other remote user to access the personal page;

> 10.  A method of providing a personal page . . ., comprising of the steps of . . . **(e)** providing the

---

[2] In particular, the prefacing language in the claims differs. This prefacing language, however, applies to the other claim elements of the six independent claims and will not be recited in this Memorandum.

page-creating remote user with a means for entering
security attributes authorizing at least one other
remote user to view the personal page;

16.   An apparatus for providing a personal page . . .
comprising . . . **(f)** means for the page-creating
remote user to enter security attributes authorizing
at least one other remote user to view the personal
page;

21.   A computer program . . . having computer readable
code to: . . . **(e)** provide the page-creating remote
user with means to input security parameters for the
personal page, the security parameters specifying
authorization of at least one other remote user to
view the personal page;

29.   [A] computer program . . . having computer
readable program code to: . . . **(e)** provide the page-
creating remote user with means to input security
parameters for the personal page, the security
parameters specifying authorization of at least one
other selected remote user to view the personal page;

32. [A] system for providing a personal page comprising . .
. **(e)** means for allowing the page-creating remote user to
input security parameters specifying authorization of at
least one other selected remote user to view the personal
page.

'216 Patent cols. 12-16.

<u>1.</u>   <u>Function</u>

The first step in construing a "means-plus-function" claim

element is to identify the function described.  Although the

parties generally agree that the function is described by the

language following "means for,"[3] they dispute the role of the remote user.

Facebook construes the claims as all sharing the function, essentially, of "allowing the page-creating remote user to enter or input the 'security attributes' or 'security parameters' for the personal page." Facebook argues that this function involves the remote user entering or inputting information (i.e., name or User ID) about both (a) the page-creating remote user and (b) the remote user to whom permission is being given. This argument is based on the construction of "security attributes" and "security parameters," which requires information about both users.[4]

TPI contends that the claimed function is the server providing the means for the user to set in motion activity which

---

[3] In general, the functions comprise the language after "means" for each of the listed claim elements, but certain claims contain language preceding "means" which is properly understood as part of the function of those elements. For example, "Providing the page-creating remote user with a means for . . ." in Claim 10(e) is construed as "means for the page-creating user . . . ." Certain other means-plus-function claim elements discussed in this Memorandum also have functions which must be construed to include a word or phrase that precedes "means for" in order to give the function its complete meaning. To avoid repetition, I will not always note when that is done.

[4] *See infra* Section III.B regarding the construction of these terms.

results in the inputting of a security parameter, and does not require a specific action on the part of the remote user, i.e., the inputting of information about both remote users.

Read in the context of the claims and the specification, Facebook's construction of the function, requiring the remote user to manually input both elements of the security parameters/attributes, improperly narrows the claimed function beyond the scope of the claim language, and must be rejected. *Lockheed*, 324 F.3d at 1319. Facebook has read an additional limitation into the claim whereby the page-creating remote user may only "enter" or "input" the security attributes by literally entering or inputting two distinct remote user names or user IDs. Facebook conflates the function and structure by arguing that the function must involve the page-creating remote user entering both aspects of the security attribute individually.

I am satisfied that TPI's construction properly identifies the function.

### 2.   Structure

The second step in a means-plus-function analysis is to identify the structure in the specification that corresponds to the function. Facebook relies on its interpretation of the function to argue that the '216 Patent discloses no structure for performing the claimed function. Facebook argues that

14

because the specification only describes processes where the page-creating remote user enters one name, (and not two, as Facebook claims is required by the function) there is no corresponding structure.  Because, as stated above, I reject Facebook's identification of the function, I also reject its claim that there is no structure disclosed and thus that the claim elements are indefinite.[5]  Facebook argues in the alternative that if the claims are definite, then TPI must be held to the structure it described in its June 16, 2010 arguments to the PTO.[6]  *See Omega Eng'g, Inc*. v. *Raytek Corp*., 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has

---

[5] Facebook's indefiniteness argument at this point relies on its proposed function being adopted.  As noted above, Facebook's proposed function involves user input of two elements.  Its argument on indefiniteness, in turn, rests on the premise that the disclosed structure does not address both elements of the proposed function.  Thus, without the second element of the proposed function, Facebook's indefiniteness argument lacks force.

[6] TPI stated before the PTO "that the structure that corresponds to the 6 identified means-plus-function elements is a Web page programmed as described to prompt the page-creating remote user for the name or user ID of the remote user to whom the page-creating remote user wishes to give permission to view the Personal Page . . . and create a security attribute consisting of the name of the page-creating remote user wishing to give permission and the remote user to whom permission is given . . . ."  *See* TPI's June 16, 2010 Response to Office Action, Dkt. No. 196 Ex. F at 14.  As noted below, Facebook's proposed structure closely tracks TPI's statement, but more accurately reflects the claim language and structure of the function I identified above.

15

unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.").

The parties propose two versions of the structure corresponding to the two embodiments described in the specification.  In the first embodiment, the remote user is "prompted for the name of the user" to whom permission is to be given.  '216 Patent col. 10 ll. 19-20.  In the second embodiment, the "remote user is prompted to send an electronic mail message to the user to whom the remote user wishes to give permission."  *Id.* at col. 10 ll. 39-41.

Facebook proposes the following structures:

a Web page programmed to prompt the page-creating remote user for the name of the remote user to whom the page-creating remote user wishes to give permission to view the page-creating remote user's personal page and to create a security attribute consisting of the name of the page-creating remote user wishing to give permission and the remote user to whom permission is given

or

a Web page that prompts a page creating remote user to send an electronic mail message to the user to whom the remote user wishes to give permission, giving the page-creating remote user an option to give permission to view the personal page, and creating a security attribute consisting of the name of the page-creating remote user wishing to give permission and the remote user to whom permission is given.

16

TPI's proposed constructions are as follows:

> a Web page that prompts a page-creating remote user for the name or user ID of another remote user to whom the remote user wishes to give access to the personal page for viewing, and executes a program that passes that name or user ID to a database for storage along with the name or user ID of the page-creating remote user

> or

> a Web page for sending an electronic message from the page-creating remote user to another remote user, the page having an option for giving permission to the other remote user to access the personal page for viewing, with selection of the option executing a program that passes that name or user ID of the other remote user to a database for storage along with the name or user ID of the page-creating remote user

One point specifically disputed by the parties is whether "user ID" should be included in the structure.  In its description of the process for granting permission, the specification states that "the remote user may be prompted for the name of the user to whom the remote user wishes to give permission."  '216 Patent col. 10 ll. 19-21.  As discussed in Section III.B *infra*, "user ID" is an equivalent or alternative to the "name" of the remote user, and as a result, it should be included in the construction of the structure here.

With respect to the other differences between the parties' proposed structures, Facebook's construction more accurately reflects the structure of the function.  It closely tracks the language in the specification at col. 10 and includes certain

17

clarifying language provided by TPI in the reexamination process, *see supra* n.6, and its proposed structure more accurately reflects the corresponding function.  The explanation of "security attribute" in Facebook's proposed construction is, however, unnecessarily repetitive.

Accordingly, I construe the structure of the six claim elements to include:

> a Web page[7] programmed to prompt the page-creating remote user for the name or User ID of the remote user to whom the page-creating remote user wishes to give permission to view the page-creating remote user's personal page, and to create a security attribute/parameter

> or

> a Web page that prompts the page-creating remote user to send an electronic mail message to the user to whom the remote user wishes to give permission, giving the remote user an option to give permission to view the personal page, and creating a security attribute/parameter

**B.    *"Security Parameters" and "Security Attributes"***

The terms "security parameters" and "security attributes" are used in claim elements 1(f), 1(g), 10(e), 16(f), 21(e), 21(f), 29(e), 29(f), 32(e), and 32(f).  The claims appear to use

---

[7]  It may be more technically accurate to say that the structure is a "Web server is programmed to transmit a Web page . . . ," but both TPI and Facebook use "Web page" as the operative actor in the structure.  The distinction is immaterial to the issues involved in this dispute, and so I adopt their position.

the terms interchangeably, and the parties agree that they are
synonymous.

Facebook construes these terms as "information consisting
of the name of the page-creating remote user wishing to give
permission and the name of the remote user to whom permission is
given."  TPI argues that these terms do not need to be
construed, because they can be understood from their plain
meaning and context and are defined in the claims in which they
appear.  TPI further alleges that Facebook construes the term
too narrowly because it includes only user names and excludes
user IDs.

The claims only explain that the entering of security
attributes/parameters authorizes remote users to view a personal
page, but do not reveal what the security attributes/parameters
are.  Because the meaning of "security parameters" and "security
attributes" in the '216 Patent is not clear from the plain and
ordinary meaning of the terms, I find that they do require
construction.  Two types of claim elements contain one of the
two terms.  The first type appears in every independent claim,
and recites, for example, "providing the page-creating remote
user with a means for entering security attributes authorizing
at least one other remote user to view the personal page."  '216
Patent col. 13 ll. 55-57.  The second type of claim element uses

only the term "security parameters" (not attributes) and appears
in independent claims 1, 21, 29, and 32.  It contains almost
identical language in each iteration and recites "storing the
security parameters in one or more databases."  *Id.* at col. 13
ll. 5-6.

The specification provides that:

> [T]he remote user may grant permission to other users to
> view the remote user's personal page.  To accomplish
> this, the remote user may be prompted for the name of
> the user to whom the remote user wishes to give
> permission.  Referring now to the Security Attribute
> Table **200** of FIG. **5**, a permission attribute, consisting
> of the name of the remote user (User ID **202**) wishing to
> give permission and the name of the user to whom
> permission is given (Viewer ID **204**), may then be stored
> in a database **96** on a local computer network . . . .

'216 Patent col. 10 ll. 17-26.[8]

Facebook argues that the quoted language defines security
attributes/parameters as consisting only of remote user names,
and that the terms "User ID" and "Viewer ID" are merely labels
applied to the remote users' names.  However, this proposed
treatment of "User ID" conflicts with other portions of the
specification and must therefore be rejected.  The paragraph
immediately preceding the quoted language, *id.* at col. 10 ll. 6-

---

[8] The specification uses the term "permission attribute" in the
narrative and "security attribute" in the corresponding table.
Like the parties, I treat the term "permission attribute" as
equivalent to security attribute/parameter.

14, references a User Information Table **126**, depicted in Figure

3.  The description of this table states that it "may include a

User ID field **128** containing a unique user identification name

or 'handle' for each user of the system."  *Id.* at col. 7 ll. 35-

37.  The specification also describes a Personal Page Values

Table **152** "which includes a User ID field **154** for identifying

the user."  *Id.* at col. 8 l. 19.  Thus, the specification

defines "user ID" and applies it in the context of two other

tables before describing the Security Attribute Table.  In

addition, the User Information Table **126** and Personal Values

Table **152** at Figure 3 and the Security Attribute Table **200**

(Figure 5) use the same identifiers for entries in the User ID

field (user1, user2, user3, etc.) further indicating "user ID"

has the same meaning in all three contexts and consists of "a

unique user identification name or 'handle.'" Figure 3 is

reproduced below:

128   130   126   132   154   152   156   158

| User Information Table | | | | | |
|---|---|---|---|---|---|
| User ID | .... | Personal Page | .... | Client ID | .... |
| user1 | | template1 | | client1 | |
| user2 | | template2 | | client2 | |
| user3 | | no page | | client2 | |
| . | | . | | . | |
| . | | . | | . | |

| Personal Page Values Table | | |
|---|---|---|
| User ID | Field Name | Value   .... |
| user1 | image | <filename> |
| . | . | . |
| . | . | . |

136   138   140   142   134   144   146   148   150

| Template Fields Information Table | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Template | Client ID | Field Name | Field Type | Field Attribute | Prompt | Heading | Position | .... |
| template1 | client1 | table | HTML table | <HTML code> | <none> | My Page | 5 | |
| template1 | client1 | image | image | <file path> | <none> | My Picture | 10 | |
| . | . | . | . | . | . | . | . | |
| . | . | . | . | . | . | . | . | |
| . | . | . | . | . | . | . | . | |
| template2 | client1 | table | HTML table | <HTML code> | <none> | My Page | 5 | |
| . | . | . | . | . | . | . | . | |
| . | . | . | . | . | . | . | . | |
| . | . | . | . | . | . | . | . | |

Viewed in the context of the entire specification, the
parenthetical "(User ID **202**)" in the description of "permission
attributes" is best understood as a shorthand referencing and
incorporating "user ID" as previously described.  TPI's
statements at the reexamination proceedings stating that the
security attribute consists of a "name" do not contradict this
finding.  The specification's definition of user ID includes a
"unique user identification name or 'handle.'"

With respect to the parenthetical "(Viewer ID **204**)," the context of the term in the narrative and the Security Attribute Table **200** both indicate that it refers to the user ID of the remote user to whom permission is being given.  The fields under Viewer ID at Figure 5, use the same type of identifier utilized as the User ID field, i.e., "user2" and "user4," and (Viewer ID **204**) modifies the name of certain remote users, just as (User ID **202**) modifies the name of the remote user wishing to give permission.  *Id.* at col. 10 ll. 24-25.  Figure 5 is reproduced below:

| Security Attribute Table | | | | | |
|---|---|---|---|---|---|
| User ID | Viewer ID | Last Viewed | Times Viewed | Page Changed | . . . . |
| user1 | user2 | 06/02/97 | 1 | no | |
| user3 | user4 | 02/01/96 | 3 | yes | |
| . | . | . | . | . | |
| . | . | . | . | . | |
| . | . | . | . | . | |
| . | . | . | . | . | |

I also find that a "security attribute" or "security parameter" consists of information about two remote users because the specification describes "*a permission attribute*" as "consisting of the name of the remote user . . . *and* the user to whom permission is given."  '216 Patent col. 10 ll. 23-25 (emphasis added).[9]  I include in my construction of these terms

---

[9]  It appears, though I need not find, that TPI adopted this definition before the BPAI, where it argued that "security attributes" consist "of the name of the remote user wishes to

the definition of User Id and Viewer ID because their meaning is not clear from the claims themselves.

For these reasons I construe "security parameters" and "security attributes" as "information consisting of both (1) the name or User ID of the page-creating remote user, and (2) the name or Viewer ID of the user to whom permission is given, where the User ID and Viewer ID are a unique user identification name or 'handle.'"

## C.   *Means for Storing the Security Parameters in One or More Databases*

Claim 32 recites "a system for providing a personal page comprising: . . . (f) means for storing the security parameters in one or more databases."  The parties agree that the claimed function of element 32(f) is "storing the security parameters in one or more databases," but disagree as to its structure.

In identifying the structure, Facebook relies on the specification's description of the Security Attribute Table, which states that "a permission attribute . . . may then be stored in a database **96** on the local computer network **82** by a CGI program executing on a CGI processor **92**."  '216 Patent col.

---

give permission, <u>and</u> the user to whom permission is given."
BPAI Hearing Transcript, Dkt. No. 282 Ex. C, at 18:22-25
(emphasis added).

10 ll. 23-28.  Facebook argues that the structure for the storing function is "database **96** and CGI processor **92** (Fig. 2) programmed to perform the algorithm at col. 10 ll. 22-28."

TPI objects to Facebook's reference to "CGI."  According to TPI, CGI (which stands for the "Common Gateway Interface") is an "interface standard used to provide programming which can interface with Web pages," and "a tool that enables the claimed steps" which is not a part of the algorithm.  TPI describes the structure as:

> a Web server that executes a program to pass the name or user ID of the page creating remote user together with the name or user ID of other remote users to whom the page-creating remote user has given permission to access the page-creating remote user's personal page in one or more databases

The parties dispute the reference to a CGI processor and/or program in several of the claim constructions, and so I discuss the issue here as it relates to all claims terms.[10]  According to the specification, CGI is "a standard for interfacing external software applications with information servers such as HTTP servers," or Web

_____

[10]  The other disputed claim terms which implicate the "CGI Processor" or a "CGI Program" are (1) means for creating a personal page having personal information, discussed at Section III.I; (2) means for storing attributes representing the personal information, discussed at III.L; and (3) means for displaying the personal page only to remote users, discussed at III.M.

servers.  *Id.* at col. 6 ll. 48-50.  In other words, CGI is a standard way for a Web server to pass a user's request on to an application program running on the server, and to receive data (e.g., from a database) to forward to the user.[11]

As a preliminary matter, the parties refer to both "CGI Programs" and a "CGI Processor."  The specification is internally inconsistent with respect to the use of these two terms.  In particular, Figure 2 indicates that item **92** is a "CGI Processor," while the narrative description refers to it as "CGI Programs."  *Id.* at col. 6 ll. 56-65.  Item **92** (which is either the Program or Processor) is described as "resident" on the Web server **86**.  *Id.* at col. 6 ll. 55-56.  There is no indication in the specification or the parties' briefing that the "CGI processor" is any different from other processors, apart from the fact that a CGI program runs on it.  As a result, I treat the processor as a generalized processor resident on the Web server which runs "CGI Programs."

TPI argues that the CGI program is not a part of the algorithm and should be excluded from the structure, relying on

---

[11]   *See* Shishir Gundavaram, CGI Programming on the World Wide Web Ch. 1.1 (1996) *available at* http://oreilly.com/openbook/cgi/ch01_01.html. CGI is commonly used to process forms which collect information from a user.  *Id.* at ch. 1.2.

*Harris Corp.* v. *Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005), to support the proposition that something that enables the performance of an algorithm is not part of the structure. Although *Harris* provides that "[a] computer-implemented means-plus-function term is limited to the corresponding structure disclosed . . . and the corresponding structure is the algorithm," *id.* at 1253, this statement must be considered in context. The Federal Circuit was not speaking to the hardware associated with performing the structure in *Harris*; it was responding to an argument that the structure is limited to the ion made this explicit by identifying the "structure for the" claimed means as "a microprocessor programmed to carry out a two-step algorithm . . . ." *Id.* at 1254.

Here, we are not dealing with hardware, but rather a type of program for passing information between the remote user and the Web server, and so TPI's argument is even more strained. TPI points out that Facebook may be including CGI in its proposed claim term because it utilizes an alternate standard. TPI's argument that the CGI program provides the same structure as other interfaces is appropriately reserved for questions of infringement. At that stage, a plaintiff must show, as proof of infringement of a means-plus-function claim, "that the accused device performs the recited function through structure that is

the same as or equivalent to the corresponding structure set forth in the specification." *Baran*, 616 F.3d at 1316-1317.  It may be the case that a CGI program is equivalent to other types of programs, but that question is not before me as part of, nor necessary to, the claim construction.

Because the CGI program is specifically called out in the specification, I find no basis for de-linking it from the algorithm.  The structure for the 32(f) claim element, as reflected in the specification at col. 10 ll. 23-27 and the description of the CGI program at col. 6 l. 46-col. 7 l.8, is: "a CGI program that accesses a database on the local computer network for storing permission attributes."[12]

### D.   *Selecting Means*

Six means-plus-function claims or claim elements describe means for the page-creating remote user to access profile information of other remote users, for the purpose of selecting which of those remote users will be permitted access to the page-creating remote user's personal page.  The claims are:

> 10(d) providing the page-creating remote user with a
> means for accessing the profile information of other
> remote users for selecting other remote users to whom

---

[12] I decline to refer specifically to database **96** in the claim construction, because that label refers to a generalized database resident on the local computer network and not a specific database formatted in a particular manner.

the page-creating remote user may wish to allow access
to the personal page;

16(e) means for the page-creating remote user to
access the profile information of other remote users
for selecting other remote users to whom the page-
creating remote user may wish to allow access to the
personal page;

23.  The method of claim 1, further comprising
providing the page-creating remote user with a means
for identifying and selecting at least one other
remote user for authorization to view personal page
that includes searching user profiles;

24. The method of claim 23, wherein the means for
identifying and selecting at least one other remote user
includes searching profile information;

29(d) provide the page-creating remote user with means to
select other remote users to whom the page-creating remote
user may wish to allow access to the personal page;

32(d) means for allowing the page-creating remote user to
select other remote users to whom the page-creating remote
user may wish to allow access to the personal page.

The parties agree that the function of each claim element is

reflected in the language following the term "means for."

Facebook argues that these elements are indefinite because there

are no corresponding structures in the specification for performing

the recited functions.  TPI contends that the elements are definite

and proposes the following corresponding structures:

at least one Web page programmed to retrieve profile
information of other remote users and display that
profile information for selection by other remote users

or

at least one Web page programmed to search profile information of other remote users and to display the profile information found in the search for selection of another remote user.

In support of its construction, TPI cites to portions of the specification which describe the general apparatus for providing a personal page to users. *See* '216 Patent col. 5 ll. 40-42; col. 6 l. 16-col. 7 l. 18; col. 7 l. 31-34. The specification's only mention of searching is a statement that "[t]he [Personal On-Line Network] may provide searching facilities which allow users of the system to search other users' profiles in an attempt to find a match." *Id.* col. 7, ll. 16-18. This statement, along with the description of the apparatus cited by TPI, does not adequately describe the structure of the claimed function and does not contain the language TPI proposes for the structure.

With respect to these claims and claim elements, "[t]he specification contains no description of the structure or the process," in this case, the algorithm, that the system "uses to perform the . . . function." *Blackboard, Inc.* v. *Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009) (finding a means-plus-function claim indefinite where the proposed structure "is simply an abstraction that describes the function of controlling access to course materials, which is performed by some undefined

30

component of the system").   As a result, claims and claim

elements 10(d), 16(e), 23, 24, 29(d), and 32(d) are indefinite,

and therefore invalid.   *EON Corp. IP Holdings LLC* v. *AT&T*

*Mobility LLC*, 785 F.3d 616, 620-23 (Fed. Cir. 2015) (noting that

means-plus-function element involving computer-implemented

functions can be invalidly indefinite unless the patentee meets

its "obligation of disclosing a sufficient algorithm as a

responding structure.").   *See generally*, *Nautilus, Inc.* v.

*Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014); *Robert Bosch,*

*LLC*, v. *Snap-On Inc.*, 769 F.3d 1094 (Fed. Cir. 2014).

**E.   *Means to Select Other Remote Users Includes Means for***
***Searching User Profiles Including Personal Information for***
***Other Remote Users***

Dependent claim elements 31 and 34 describe searching claim

elements as follows:

> 31. The computer program product of claim 29, wherein
> the means to select other remote users includes means
> for searching user profiles including personal
> information for other remote users.

> 34. The system of claim 32, wherein the means to
> select other remote users includes means for searching
> user profiles including personal information for other
> remote users.

The parties again agree that the function consists of the

language following "means" in the two claims, and they make the

same (or similar) arguments as those described *supra* at Section

III.D for the selecting means.   Facebook argues that the claims

31

are indefinite for failure to describe adequately, and TPI
proposes the structure of "at least one Web page programmed to
search profile information of other users and to display that
profile information found in the search for selection of another
remote user." As with the claims rejected in Section III.D.
above for indefiniteness, I reject TPI's proposed structure and
find that claims 31 and 34 are indefinite because they are not
tied to a disclosed algorithm.

**F.   *Means for the Page-Creating Remote User to Include a Voice
       Greeting in the Personal Page***

Dependent claim 27 claims "[t]he method of claim 1, further
comprising providing means for the page-creating remote user to
include a voice greeting in the personal page." The parties
agree that the function of this means-plus-function claim is
described by the language following "means for."

Facebook argues that this term is indefinite because the
specification discloses no corresponding algorithm. TPI
proposes the following structure:

> a Web page programmed to allow the page-creating
> remote user to transfer an audio file containing a
> voice greeting to the computer network, the audio file
> being accessible during the rendering of a personal
> page so that a viewer of the personal page can hear
> the voice greeting.

In support of its proposed structure, TPI cites the
specification's statement that "[t]he [Personals On-Line Network]

32

may also provide a method and apparatus for storing voice greetings.  Such voice greetings may be made accessible from the personal page of the invention."  '216 Patent col. 7 ll. 21-23. TPI also points to Figure 1, which shows a network for receiving and storing personal advertisements and storing responses to advertisements, *id.* col. 3 ll. 32-34, and the description of Audio Text System ("ATS") machines.  ATS machines coupled to the network via communications links record, store, and make accessible "telephone responses to personals."  *Id.* col. 4 ll. 36-45.

Again, the specification does not describe a structure — that is, an algorithm — for including a voice greeting on the personal page in the provisions cited by TPI or elsewhere.  This claim element is therefore indefinite and invalid.

**G.   *Means for Providing a Page-Creating Remote User with a Plurality of Pre-Stored Templates for Selection for the Personal Page***

Claim element 16(b) recites a "means for providing a page-creating remote user with a plurality of pre-stored page templates for selection for the personal page."  The parties agree that the function for this claim element is described by the language following "means for."  They also agree that the term "template" means "a World Wide Web style page design which includes graphics and page layout information" and that a

33

"plurality of page templates" means "two or more page

templates."[13]

Facebook argues that there is no corresponding structure

for this function, and that the claim element is therefore

indefinite.  TPI proposes the following structure:

> a Web page that presents a plurality of templates, the
> templates being World Wide Web page designs that
> include graphics and page layout information stored on
> the computer network as HTML page descriptions, for
> selection by the page-creating remote user for display
> on his or her personal page.

TPI cites the following passage of the specification to

support its proposed structure:

> Following the Create or Edit Personal Page **164** option,
> the remote user **70** may be presented with a Choose
> Template **172** page.   The Choose template page **172**
> presents the remote user **70** with a variety of templates
> which can provide a graphical layout for the remote
> user's personal page. . . .   A finite number of templates
> are provided for selection by the remote user.   The
> templates are stored in an appropriate node of computer
> network **82** as HTML page descriptions.

'216 Patent col. 8 ll. 42-46, 55-57.

Unlike the prior three claim elements, I find that this

claim element is definite because it is tied to a disclosed

algorithm.  It is properly construed, in reference to the cited

provision of the specification, as follows: "a Web page

---

[13] "Page template" is a disputed term discussed *infra* at Section
III.P.

programmed to present to the remote user with a plurality of page templates, finite in number, for selection by the remote user for the personal page."

## H.   *Means for Storing Profile Information Relating to Each Remote User*

Claim limitations 16(a) and 32(a) relate to the storing of profile information.  Limitation 16(a) recites "means for storing profile information relating to each remote user," and 32(a) recites "means for storing profile information relating to each remote user, the profile information being accessible to other remote users of the system."  The parties agree that the function of these claim elements consist of the language following "means for."  The term "profile information," is construed *infra* at Section III.R as "information regarding the remote user and regarding the type of person that the remote user would like to meet, which may be accessible and/or searchable by other remote users."

Facebook argues that there is no corresponding structure for the functions and the claims are indefinite.  TPI's position is that the structure for both claims is "a Web server that executes a program to pass profile information of the remote user to one or more databases that store said information together with the name or user ID of the remote user."

35

The bulk of the specification provisions cited by TPI in support of its construction describes generally the "apparatus for providing a personal page." *Id.* at col.6 l.16-col.7 l.8. TPI also cites the following passage:

> The [Personals On-Line Network] may be implemented over the Internet **74** using HTML pages and CGI programs. The [Personals On-Line Network] may include personals advertisements as well as more specific profile information regarding the advertiser and regarding the type of person that the advertiser would like to meet. . . . An exemplary database structure useful with the invention is illustrated in FIG. **3**. User Information Table **126** may be used by the [Personals On-Line Network] to store a variety of information relating to users of the system.

*Id.* at col. 7 ll. 11-16, 31-34. TPI argues that "a variety of information relating to users of the system" includes a user's profile information. TPI's logic is that a Personals On-Line Network "may include . . . personal information," *id.* at col. 7 ll. 13-14, "may be implemented over the Internet using HTML pages and CGI programs," *id.* at col. 7 ll. 11-12, and may use a User Information Table to store the profile information. The description of a User Information Table goes on to say that "[f]or the purposes of the invention . . . [it] may include" certain fields, *id.* at col. 7 ll. 34-50, but none of the fields are explicitly linked to profile information. Even so, I find it clear enough in context that profile information can be

included in the User Information Tool or other database
structure.

I therefore find that the structure of this claim is
definite but reject the proposed construction offered by TPI.
In particular, I find that the CGI program performs the
function, and I reject TPI's reference to "name" and "user Id" as
extraneous. The corresponding structure is "a CGI program which
accesses a database on the local computer network for storing
profile information."

## I.   *Means for Creating a Personal Page Having Personal Information*

Two claim limitations recite means-plus-function elements
related to the creation of a personal page having personal
information:

> 29(b) provide a page-creating remote user with means to
> create a personal page having personal information

> 32(b) means for creating a personal page having personal
> information for a page-creating remote user

The parties agree that the functions consist of the
language following "means" in the two claim elements.  They also
agree that the term "personal page" means "a page that includes
information entered by a page-creating remote user."  Facebook
suggests that the function's corresponding structure is "a Web
server **86** including database **96** and CGI processor **92** (Fig. 2)

programmed to perform the algorithm set forth in Figure 4 (steps 164, 72, 74, 76 and 180) as described in col. 8 l. 43-col. 9 l. 43)." TPI offers the following construction:

> at least one Web page that provides at least one of:

> at least one field to receive text from the page-creating remote user for display on the personal page

> and

> presenting the page-creating remote user with options to select an image to display on the personal page from a collection of images previously stored or to upload an image, such as a GIF or JPEG image, from the

> page-creating remote user's remote computer to display on the personal page.

Figure 4, which Facebook relies upon in proposing its structure, depicts a flow-chart presented as an "exemplary method for providing a personal page," *id.* at col. 8 l. 24. The chart depicts discrete steps for providing a personal page, where each step may be represented as separate Web pages, *id.* at col. 8 l. 26-28. These steps consist of choosing a template, choosing a background, choosing an image, and entering text. *See id.* at Figure 4, col. 8 l. 42-co.9 l. 43. Facebook takes the position that the function of creating a personal page also includes the storing of "attributes" corresponding to the selections and entries, which is performed by a CGI

38

processor and database.  Figure 4 is reproduced below:

TPI asserts that Facebook's structure incorporates



unnecessary limitations into the claim element.  In particular, TPI objects to the inclusion of template selection as part of the structure, or in particular as the first step, and argues that the specification merely makes template selection permissive.  *See id.* at col. 8 l. 43 (stating that the remote user "may be presented with" a

page for choosing a template).  TPI further asserts that
the claimed Personal Page is a page "having personal
information," and no more.

The specification and claims generally describe a process
for creating personal page that includes the selection of a
template.  *See, e.g.*, *id.* claim elements 1(b), 10(a), 16(b), and
21(a); col. 2 ll. 40-41; col. 3 ll. 2-4; col. 7 ll. 24-26; col.
7 l. 52-col. 8 l. 2; col. 8 ll. 42-65.  Despite these repeated
references to template selection, the Summary of the Invention
implies it is not necessary, stating that the invention "includes
means for displaying at a user site at least one template."  *Id.*
at col. 2 ll. 24-25.  The Summary goes on to reference an
embodiment involving the selection of a template.  *Id.* at col. 2
ll. 40-41.

Although the patent frequently discusses the selection of
templates and the preferred embodiment includes the selection of
templates, the claims cannot be construed as so limited in light
of the Summary of the Invention.  *See Laryngeal Mask Co. Ltd.* v.
*Ambu A/S*, 618 F.3d 1367, 1371-72 (Fed. Cir. 2010) (finding that,
although the specification was "replete with discussion of a tube
joint" and "[t]he preferred embodiment states that the backplate
has a tube joint," the term backplate was not limited to include
a tube joint because there was no mention of a tube joint in the

40

claim, only one place in the specification indicated the tube joint was part of the backplate, and because the Summary of the Invention was broad enough to exclude the term).  The two claims at issue do not turn on the selection of templates, and as a result, selection of a template is not a limitation of the elements.

With respect to the storage of attributes, it is clear from both the claims and the specification that this step is separate from the "creation" of the personal page, which involves the selection of certain features, entering of information, and acceptance of the personal page.  *See* '216 Patent col. 9 ll. 49-56.  Prior to this step, the attributes are "stored temporarily," *id.* at col. 9 l. 47, and "[i]f the remote user chooses to accept the personal page that the remote user has created or edited . . . the attributes of that personal page are stored in database **96**," *id.* at col. 10 l. 6-8.  The characterization of the creation of the personal page and the storage of the attributes as separate steps is further supported by the structure of claims 29 and 32, which break out the storage of security parameters in separate claim elements, in 29(f) and 32(f) respectively.

For these reasons, I reject the structure proposed by Facebook.  TPI's briefs do not press any portion of the

41

specification in support of its proposed structure.  I adopt
language which more closely mirrors that which appears in the
specification at col. 2 ll. 22-28 and col. 7 ll. 24-29:

> a Web page or series of Web pages programmed to provide
> at least one template for the display of the remote
> user's personal information and programmed to prompt the
> page-creating remote user to enter or select text,
> graphics or other information to be included in a
> predetermined area of the template(s) and capable of
> being stored on a local computer network.

**J.   *Means for the Page-Creating Remote User to Contribute Text
to the Personal Page***

Claim elements 10(b) and 16(c) recite means-plus-function
limitations related to the contribution of text to the personal
page as follows:

> 10(b) providing a page-creating remote user with a means
> for contributing text to the personal page;
>
> and
>
> 16(c) means for the page-creating remote user to
> contribute text to the personal page.

The two parties agree that the claimed functions in the two
elements consist of the language following "means for."

Facebook identifies the corresponding structure as "a
series of Web pages programmed to allow the remote user to enter
text, or a single Web page with a series of fields for entering
text, depending on the template selected by the page-creating
remote user."  TPI proposes that the structure is "at least one

Web page having at least one field to receive text from the page-creating remote user for display on the personal page."

Both parties rely on the specification's description of the Enter Text page (labeled **180** on Figure 4) at col. 9 ll. 31-43. Facebook argues that the selection of the template is intrinsic to the contribution of text because the specifications states that "[d]epending upon the template selected, the remote user may be presented with a series of Enter Text **180** pages, or a series of fields for entering text on a single Enter Text **180** page." *Id*. at col. 9 ll. 40-43.  TPI argues that Facebook's reference to templates is superfluous because template selection is separately addressed in claim limitations 10(a) and 16(b).

Because the claimed element does not address templates, I reject the inclusion of the term "depending on the template selected by the page-creating remote user" proposed by Facebook. Following the language of the specification at col. 9 ll. 31-43, I find that the structure of the function is "a Web page or series of Web pages, each having at least one field for entering text, programmed to allow the remote user to enter text for display on a personal page."

**K.**   ***Means for the Page-Creating Remote User to Contribute Graphics to the Personal Page***

Claim elements 10(c), 16(d), and dependent claim 33 contain

means-plus-function limitations relating to the page-creating

remote user's contribution of graphics to the personal page.

These limitations are as follows:

> 10(c) providing the page-creating remote user with a
> means for contributing graphics to the personal page
>
> 16(d) means for the page-creating remote user to
> contribute graphics to the personal page
>
> 33. The system of claim 32, wherein the means for
> creating a personal page having personal information for
> a page-creating remote user includes means for placing
> graphical information on the personal page.

Facebook and TPI agree that the claimed functions are reflected

in the language following "means for."  Facebook proposes the

following corresponding structure for all three functions:

> A Web page programmed to present a remote user with
> background graphics which may be selected for display
> with the personal page, and presenting the page-
> creating remote user with options to select an image
> for display on the remote user's personal page from a
> collection of images previously stored or to upload an
> image, such as a GIF or JPEG image, from the page-
> creating remote user's remote computer to display on
> the personal page.  Depending on the template
> selected, the remote user may be presented with more
> than one opportunity to select or upload an image.

TPI proposes a structure consisting of

> A Web page presenting the page-creating remote user with
> options to select an image to display on the personal page
> from a collection of images previously stored or to upload
> an image, such as a GIF or JPEG image, from the page-
> creating remote user's remote computer to display on the
> personal page.

44

Facebook relies on the specification's description of the
Choose Background and Choose Images pages at col. 8 l. 66-col. 9
l. 30.   Unlike TPI, Facebook alleges that the selection of
"background graphics" described as part of the "Choose Background"
step should be included in the structure for the contribution of
graphics.   Facebook again advances the argument (described *supra*
at Section III.J with regard to the contribution of
texttribution of graphics is dependent on the template chosen,
the selection of the template should be incorporated in the
structure.

For the reasons discussed above, I again reject
Facebook's inclusion of the last sentence of its proposed
structure.   I also find that the claim elements' reference
generally to the contribution of "graphics" encompasses both
"background graphics" and "images."   *See* '216 Patent col. 8 l.
66-col. 9 l. 30.   I therefore find that the corresponding
structure is

> a Web page or Web pages programmed to present the remote
> user with background graphics which may be selected for
> display with the personal page and/or programmed to
> present the remote user with the option to select an
> image for display on the personal page from a collection
> of images previously stored on a local computer network,
> or to enter or upload an image, such as a GIF or JPEG
> image, from the remote user's remote computer for display
> on the personal page.

**L.    *Means for Storing Attributes Representing the Personal Information in the Page-Creating Remote User's Personal Page in One or More Databases***

Limitation 32(c) recites a "means for storing attributes representing the personal information in the page-creating remote user's personal page in one or more databases."  The parties agree that the claim function consists of the language following "means for" but disagree as to the corresponding structure.

Facebook proposes a structure of "a Web server including database **96** and CGI processor **92** (Fig. 2) programmed to perform the algorithm set forth in col. 10 ll. 6-14."  TPI proposes "a Web server that executes a program to pass attributes representing the personal information of the page-creating remote user to one or more databases that store said attributes together with the name or user ID of the page-creating remote user."

The specification's description of attribute storage, referenced in Facebook's construction, provides that

> the attributes of [an accepted] personal page are stored in database **96** on the Local Computer Network **82**.  That is, upon acceptance of the page by the remote user, the attributes of the personal page are stored in the database system **96** by inserting rows containing the information described above into the

46

> User Information Table **126** and Personal Pages Values
> Table **152**.

'216 Patent col. 10 ll. 8-15.

In light of the apparatus described at col. 5 l. 59-col. 7 l. 8, and the description of the storage of attributes at col. 10 ll. 6-14, and the database tables in col. 7, I find that the corresponding structure of this claim element is "a CGI program to store attributes representing the personal information entered and selections made by the remote user for the display of the personal page in a database on the Local Computer Network by inserting rows containing the information into a User Information Table **126** and Personal Values Table **152**."

## M.   *Means for Displaying the Personal Page Only to Authorized Remote Users*

Claim element 16(g) recites a "means for displaying the personal page only to authorized remote users."  The parties agree that the claimed function for this element is the language following "means for" but they disagree as to the corresponding structure.

Facebook argues that the structure is properly construed as "Display 308 and CGI processor **92** (Fig. 2) programmed to implement the algorithm described in specification at col. 11 ll. 4-21."  TPI's proposed structure is:

at least one Web page that allows a remote user to
select a personal page of a page-creating remote user
that the remote user is authorized to see based upon a
stored security attribute, and executing a program to
assemble the attributes of the selected personal page
from one or more databases to display that personal
page in the manner of a World Wide Web page.

The specification describes the following process, which

Facebook cites as part of its proposed structure:

Access to a personal page of the invention may then
proceed as follows.  When a remote user chooses to view
a personal page which that remote user has permission to
see, a CGI program is executed on server **86** (FIG. **2**) to
display the personal page to the remote user.   The
program first looks up the User ID **128** of the creator of
the personal page in the User Information Table **126** and
retrieves the template name from the Personal Page field
**130**.   The program next locates each entry in the
Template Fields Information Table **134** which corresponds
to the template name.  Using the Field Name field **140**
from the Template Fields Information Table **134** and the
User ID **128** of the creator of the personal page, the
program locates the Value **158** in the Personal Page Values
Table **152** which corresponds to each of the fields in the
template.  The program then assembles all of the fields
corresponding to the personal page and 'prints' them in
the manner of a World Wide Web page to be viewed by the
remote user having permission to view the personal page.

'216 Patent col. 11 ll. 4-21.  Facebook's proposed structure includes

this algorithm, as well as CGI processor and the viewing user's

computer screen, display **308**.   The display is described as part of a

"computer system **300** on which the invention may be implemented," *id.*

at col. 11 ll. 29-30, and is depicted at Figure 7.   *See id.* at col.

11 ll. 29-45.

The structure of this claim element must include the "only to authorized remote users" limitation, as TPI's construction does.  The description of how the display of personal pages is limited to authorized users is:

> The remote user may also be given the opportunity, from the Personal Page Menu **160** to view the personal pages of other users (View Personal Pages **170**).  Upon choosing this option, the remote user may be presented with a list of other users who have given the remote user permission to see their personal pages.  Such a list might be generated by reviewing the Security Attribute Table **88** for records indicating permissions given to the remote user.

Incorporating this aspect of the claim element, along with the algorithm property identified by Facebook, I find that the structure is properly construed as

> A Web page programmed to present a remote user with a list of users who have given the remote user permission to see their personal pages, generated by a CGI program which reviews the Security Attribute Table for records indicating permissions given to the remote user.  When a remote user chooses to view a personal page from this list, a CGI program is executed on the Web server as described at col. 11 ll. 8-21.

**N.   *Prompting (a remote user)***

The term "prompting" appears in claim elements 1(b), 1(c), and 1(d), while the term "prompt" appears in 21(a), 21(b), and 22(c).  All six claim elements involve "prompting" the remote user to undertake a task, and the full text of the relevant elements of Claim 1 is as follows:

49

1(b) prompting a page-creating remote use with a plurality of page templates for the personal page and receiving a template selection from the remote user;

1(c) prompting the page-creating remote user to enter text to the personal page and receiving entered text from the remote user;

1(d) prompting the page-creating remote user to enter text to select or enter graphical information to display on the personal page and receiving the selection or entry from the remote user;

The Claim 21 elements contain almost identical language prefaced by "prompt" instead of "prompting."

Facebook construes this term as "requiring (a remote user) to make a selection, give an answer, or enter information." Facebook argues that "prompting" is a term of art and cites to the MICROSOFT PRESS, COMPUTER DICTIONARY (3d. ed. 1997), a technical dictionary which defines "prompt," as "Displayed text indicating that a computer program is waiting for input from the user." *Id.* at 486. TPI construes the term as "urging (a remote user) to provide information," and argues that Facebook's construction is contrary to the ordinary meaning of the word "prompt" which does not have a mandatory connotation.

The uses of "prompt" and "prompting" in the claims and specification do little to illuminate their meaning,[14] but the

---

[14] For example, a passage referenced by TPI states:

[a] personal page may be generated and stored by

descriptions of the "prompting" activities shed light on the term's intended meaning.  For example, the description of the "Enter Text" page states that it "may allow the remote user to enter any free form text," or it "may present the remote user with questions to answer."  *Id.* col. 9 ll. 33-36.  This description of the page where the remote user is "prompted" to enter text provides no indication that any activity is *required*.  Rather, neutral terms such as "allow" and "present" are used.  As a result, I reject Facebook's proposed construction.

In addition, although "urge" may be a synonym for "prompt" in certain contexts, this is not one of them.  Urge connotes a manner of "prompting."  This manner is described in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2521 (1986) as "an earnest or pressing manner," and is not implicated by the context of the term in the claims or specification.  I construe the term instead in neutral terms as "requesting that (a remote user) provide information."

*O.*   *Page*

The term "page" is used in several contexts in the claims,

---

prompting a remote user **70** who desires to generate a page to select a template for the personal page, then prompting the page-creating remote user **70** to enter or select text, graphics or other information . . ."

'216 Patent col. 7 ll. 24-30.

including "page-creating remote user," "personal page," and
"page template."  TPI construes the term as "Web page," and
Facebook argues that there is no need to construe this term.
TPI's construction appears to respond to a construction that
Facebook previously proposed but has since abandoned.  I find no
need to construe the term because it is clear from the context
of the patent that "page" refers to a "Web page."  In addition,
replacing "page" with "Web page" would only serve to obscure its
meaning.  For example, the term "Web page-creating remote user,"
could be read to refer to a user who creates a generalized Web
page, rather than the specific type of page discussed in the '216
Patent.

**P.   *Page Template***

As noted, the parties agree that a "template" is "a World
Wide Web style page design which includes graphics and page
layout information."  They disagree on the construction of "page
template" or "page templates," a term appearing throughout the
claims and claim elements.  Facebook construes the term as "a
template with a number of fields that may include user entries
or selections for personalizing the personal page."  TPI argues
the term requires no construction apart from the individual
constructions of the words "page" and "template" and therefore
construes the term as "a Web page having a World Wide Web style

52

page design which includes graphics and layout information."

The specification provides that the "template may be designed to include a number of fields that may include user entries or selections," '216 Patent col 8. ll. 49-52, and generally describes the creation of a personal page through the remote user's entering of information and selections, *id.* at col. 8. l. 66-col. 9 l. 43.   In addition, the Summary of the Invention states that it includes "means for inputting user-data to be included in a pre-determined area of the template."  *id.* at col. 2 ll. 26-27.  As a result, the template must include at least one field for entering personal information.

I construe this term as "a template with at least one field for the inputting of the remote user's personal information." Facebook's specific reference to the personal page is unnecessary, as the claims themselves make it clear that the page templates are "for the personal page."

## Q.   *Providing/Prompting . . . with a Plurality of Page Templates*

Claim elements 1(b), 10(a), 16(b), and 21(a) each recite a term involving the "providing" or "prompting" of the page-creating remote user "with a plurality of page templates."  As previously noted, the parties have agreed that a "plurality of page templates" means "two or more page templates."

53

TPI argues that this term does not need a separate
construction from the constituent terms.  Facebook argues that
TPI narrowed the scope of the claim before the BPAI, which the
BPAI subsequently adopted, to require that multiple templates be
presented to the user and that mere customization of a personal
page does not suffice.  Thus, Facebook proposes that the element
should be construed as "requiring a page-creating remote user to
choose a page template from two or more different page
templates, each page template specifying one or more categories
of information for placement on the personal page and the
location of the categories on the personal page."  Facebook
proposes that customizing a personal page through a user's entry
or selection of information is excluded from the scope because
the BPAI suggested that such customization by data entry, rather
than by selection of a template from multiple options, would be
anticipated by de Hond.

I find that TPI narrowed its claim before the BPAI, and it
is bound by that construction.  Before the BPAI, TPI argued that
de Hond did not anticipate the '216 Patent because in de Hond,
"the template of the page doesn't change. . . . The user isn't
selecting different page templates that give different layouts
to the information." *See* Dkt. No. 282 Ex. C at 24-25; *see also*
*id.* at 26 (arguing that de Hond "doesn't show a plurality of page

54

templates that a user can select between"). The BPAI
subsequently adopted this reasoning in its decision. *See* BPAI
Decision at 9 ("[W]hile the Examiner finds that de Hond provides
for customized pages, which is the purpose of the page templates
in the instant invention, we do not find that the same result
belies the same method. The cited independent claims recite the
use of page templates and any anticipatory reference must teach
or make inherent the presentation of multiple page templates to
a user.").

Thus, I construe the element as Facebook does, as
"requiring a page-creating remote user to choose a page template
from two or more different page templates, each page template
specifying one or more categories of information for placement
on the personal page and the location of the categories on the
personal page."

**R.** **"Profile Information" and "Profile Information . . .
Accessible to Other Remote Users"**

The terms "Profile information," and "profile information .
. . accessible to other remote users" are both disputed, and I
analyze them together. "Profile information" appears in the
following claims or claim elements: 1, 1(a), 10, 10(d), 16,
16(a), 16(e), 24, 29(a), and 32(a); it appears in conjunction

with "accessible to other remote users" at claim 1 and claim elements 29(a) and 32(a).

TPI argues that the term "profile information" needs no construction but would construe the two terms together as "information that can be viewed by remote users including remote users who have not been authorized to view the information owner's personal page (if any)." TPI suggests its construction properly distinguishes between profile information and a user's personal page as separately accessible because otherwise, the '216 Patent would not accomplish the system's stated goal of making profile information available while still allowing the user to keep his personal page restricted. For example, TPI notes that claim 10 provides "the page-creating user with a means for accessing profile information of other remote users for selecting other remote users to whom the page-creating remote user may wish to allow access to the personal page." '216 Patent col. 13, ll. 50-54. That claim, TPI contends, makes clear that the profile information and personal page are separately accessible, a distinction that is only properly reflected in its own proposed construction.

Facebook construes "profile information" as "information regarding a remote user and regarding the type of person that the remote user would like to meet," and argues that no separate

56

construction is needed for the longer phrase.  TPI argues that
Facebook's proposed construction improperly ignores the context
of the surrounding phrase.

The specification states that

[t]he [Personals On-Line Network] may include personals
advertisements as well as more specific profile
information regarding the advertiser and regarding the
type of person that the advertiser would like to meet.
The [Personals On-Line Network] may provide searching
facilities which allow users of the system to search
other users' profiles in an attempt to find a match.

'216 Patent at col. 7, ll. 13-16.  This passage provides a
definition and also explains the purpose of "profile
information."  TPI argues that the phrase "may include" should
be read as permissive and should not restrict the definition of
"profile information" to the above cited specification language.
This argument is flawed because "may" does not address what
profile information "may" include but rather what the Personals
On-Line Network "may" include.

I construe "profile information" as "information regarding the
remote user and regarding the type of person that the remote user
would like to meet, for the purpose of making it accessible and/or
searchable by other remote users."  There is no need to separately
construe the term "profile information . . . accessible to other
remote users," as the term "accessible to other remote users" may be
understood from its ordinary meaning in this context.

57

### S.   *Attributes*

The term "attributes" appears in claim elements 1(e), 5, 6, 8, 10(e), 13, 15, 16(f), 19, 20, 21(d), 22, 29(c), 32(c).   The term "security attributes" is separately construed *supra* at Section III.A.   Facebook argues that the term does not require construction, while TPI would construe the term as "representations of information used to display the personal page."

TPI's construction relies on the Summary of the Invention, which states:

> The system stores attributes representing the layout of the personal page, the text and graphics contributed by the remote user, and the authorization information entered by the remote user in the one or more databases stored in the server computer.   The personal page may then be displayed upon request to an authorized view by retrieving attributes of the personal page from the one or more databases, creating a graphical page display from the attributes, and displaying the page to the authorized viewer.

'216 Patent col. 2 ll. 44-53.

The specification goes on to describe the process whereby attributes are generated from the remote user's activity and stored in databases.   *See id.* at col. 8 l. 55-col. 10 l. 46. Because the '216 Patent does not use the term "attribute" in its ordinary sense, it requires construction.   As Facebook notes in its briefing, an "attribute" as described in the Patent

58

represents selections made by the user.  I construe this term as "representation."

I reject the additional explanation of the term proposed by TPI, because the information it provides is superfluous and repetitive of the information provided by the claim terms themselves, which explain what is represented by the attributes and how they are used. *See, e.g., id.* Claims 1(e), 15, 20, 21(d), 22, 32(c).

**T.   *Displaying***

The term "displaying" and/or "display" appears in claims and claim elements 1(h), 8, 10(f), 15, 16(g), 20, 21(g) and 22. All uses of the term relate to the displaying of the personal page.  Facebook argues that the term should be construed according to its ordinary meaning as "visually presenting."  TPI proposes the construction of "serving a Web page," arguing that, because the '216 Patent is written from the "perspective of one or more Web servers" the term should be construed from that perspective.

The specification describes the "CGI program . . . executed on a server . . . to display the personal page to the remote user."  *Id.* at col. 11 ll. 7-8.  In the final step of that process, "[t]he program then assembles all of the fields corresponding to the personal page and 'prints' them in the manner

59

of a World Wide Web page to be viewed by the remote user having permission to view the personal page." *Id.* at col. 18-21.

TPI's position is taken in reference to Facebook's non-infringement contentions, in which Facebook argues that the "displaying" occurs only on a remote user's computer screen. Facebook's Response to TPI's Claim Construction Brief confirms that it understands the "displaying" to occur on the user's "display."

"Displaying" is an activity undertaken by the claimed system, as described in the specification.  As a result, I adopt the specification's language and find that the term is properly construed as "'printing,' in the manner of a World Wide Web page."

## U.   *Accessing (by a remote user)*

The term "accessing (by a remote user)" or "access (by a remote user)" appears in claim elements 10(d) and 15 (e).  The similar term "accessible (to a remote user)" appears in the preambles of claims 1, 10, and 16 and claim elements 29(a) and 32(a).  Facebook argues that the term needs no construction, and TPI construes the term as "viewing (by the remote user)."  TPI argues that the two words "access" and "view" are used interchangeably in the '216 Patent, pointing to a passage that uses both with reference to the personal page.  However, the

60

term "accessing" is only used in the claims with respect to
*profile information*, not the personal page ("access" is used in
reference to both).  It is unclear from the context of the
claims that the term "accessing" is in fact interchangeable with
"viewing."  In any event, there is no need to construe this
term, as it can be understood in the patent from its ordinary
meaning.[15]

## V.   *"Authorization," "Authorized" and "Authorizing"*

The terms "authorization" and/or "authorized" appear in
claims and claim elements 1(f), 8, 15, 16(f), 20, 21(e), 22, 23,
29(e), and 32(e).  "Authorizing" appears at claim elements 10(e)
and 16(f).  TPI takes the position that these terms do not need
to be construed.  Facebook construes "authorization" and
"authorized" as "the state in which the system allows a remote
user to access the personal page," and "authorizing" as "setting
the state in which the system allows a remote user access to the
personal page."  Facebook advances these constructions in light
of TPI's infringement claims.  According to Facebook, these
allegations necessitate the clarification that the '216 Patent

---

[15] TPI alleges that Facebook attempts to include "searching" as
well as "viewing" in the meaning of "accessing."  Facebook
advances no such argument in its claim construction briefing.

describes authorization granted solely by the page-creating
remote user.

Irrespective of the infringement claims and defenses
anticipated by the parties, it is not necessary to construe
these terms, as they can be understood from their ordinary
meanings, which would only be obscured by the construction
Facebook proposes.

## W.   A Remote User

The term "remote user" is used throughout the claims and
specification.  Facebook construes this term as "a person who is
able to create or view a personal page," while TPI construes it
as "a person who is able to use a claimed system or method over
a computer network."  Facebook's construction is overly limiting.
A remote user is described in certain of the claim terms as
merely "having profile information." *See id.* Claims 1, 10, 16.
As a result, I adopt TPI's construction and construe "remote user"
as "a person who is able to use a claimed system or method over a
computer network."

## X.   Page-Creating Remote User

The final disputed claim term, "page-creating remote user,"
appears throughout the claims and specification.  Facebook
construes this term as "a remote user who is creating a personal
page," while TPI construes it as "a remote user who is creating

62

or has created a personal page by entering information for display on the personal page."

Facebook argues that its construction mirrors the term itself, which uses the present tense of the word "creating." TPI argues that the construction must include "has created" because the claim terms describe the page-creating remote user's inputting or entering of security parameters or attributes, which occurs after the page is created. *See id.* Claims 1(f), 10(e), 16(f), 21(e), 29(e), and 32(e). The specification refers to the storing of the attributes of the "personal page . . . that the remote user has created" and then goes on to describe the granting of permission to other users. *Id.* at col. 10 ll. 6-21. As a result, a page-creating remote user is not only a user who is creating a personal page, but may also be one that has created a personal page.

TPI includes the phrase "by entering information for display on the personal page" in its construction to respond to an argument advanced by Facebook in its infringement defense. I find that the phrase is unnecessary and extraneous when considered in the context of the claims. As a result, I construe the term as "a remote user who is creating or has created a personal page."

63

## IV. CONCLUSION

For the reasons set out more fully above, I CONSTRUCT the terms of the various disputed claims as set forth in this Memorandum and as summarized in Appendix A, attached hereto.

*/s/ Douglas P. Woodlock*_____

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

# APPENDIX A

### SECTION III.A.

| Phrase(s) in Patent | "Security Parameters" or "Security Attributes" "Entering" or "Inputting" Means |
|---|---|
| TPI's Construction of Function | the server providing the means for the user to set in motion activity which results in the inputting of a security parameter (without requiring specific action by remote user) |
| Facebook's Construction of Function | "allowing the page-creating remote user to enter or input the 'security attributes' or 'security parameters' for the personal page." |
| Court's Construction of Function | 1 (f): (the page-creating remote user) inputting security parameters for the personal page, the security parameters specifying authorization of at least one other remote user to access the personal page

10 (e): (the page creating remote user) entering security attributes authorizing at least one other remote user to view the personal page

16 (f): the page-creating remote user entering security attributes authorizing at least one other remote user to view the personal page

21 (e): (the page creating remote user) inputting security parameters for the personal page, the security parameters specifying **[continued]** |

| | |
|---|---|
| | authorization of at least one other remote user to view the personal page<br><br>29 e): (the page creating remote user) inputting security parameters for the personal page, the security parameters specifying authorization of at least one other selected remote user to view the personal page<br><br>32 e): allowing the page-creating remote user to input security parameters for the personal page, the security parameters specifying authorization of at least one other remote user to access the personal page |
| **TPI's Construction of Structure** | "a Web page that prompts a page-creating remote user for the name or user ID of another remote user to whom the remote user wishes to give access to the personal page for viewing, and executes a program that passes that name or user ID to a database for storage along with the name or user ID of the page-creating remote user"<br><br>or<br><br>"a Web page for sending an electronic message from the page-creating remote user to another remote user, the page having an option for giving permission **[continued]** |

| | |
|---|---|
| | to the other remote user to access the personal page for viewing, with selection of the option executing a program that passes that name or user ID of the other remote user to a database for storage along with the name or user ID of the page-creating remote user" |
| **Facebook's Construction of Structure** | "a Web page programmed to prompt the page-creating remote user for the name of the remote user to whom the page-creating remote user wishes to give permission to view the page-creating remote user's personal page and to create a security attribute consisting of the name of the page-creating remote user wishing to give permission and the remote user to whom permission is given"<br><br>or<br><br>"a Web page that prompts a page creating remote user to send an electronic mail message to the user to whom the remote user wishes to give permission, giving the page-creating remote user an option **[continued]** |

| | |
|---|---|
| | to give permission to view the personal page, and creating a security attribute consisting of the name of the page-creating remote user wishing to give permission and the remote user to whom permission is given." |
| **Court's Construction of Structure** | "a Web page programmed to prompt the page-creating remote user for the name or User ID of the remote user to whom the page-creating remote user wishes to give permission to view the page-creating remote user's personal page, and to create a security attribute/parameter"<br><br>or<br><br>"a Web page that prompts the page-creating remote user to send an electronic mail message to the user to whom the remote user wishes to give permission, giving the remote user an option to give permission to view the personal page, and creating a security attribute/parameter" |

**SECTION III.B.**

| Phrase(s) in Patent | "Security parameters" and "security attributes" |
|---|---|
| TPI's Construction | None necessary |
| Facebook's Construction | "information consisting of the name of the page-creating remote user wishing to give permission and the name of the remote user to whom permission is given" |
| Court's Construction | "information consisting of both (1) the name or User ID of the page-creating remote user, and (2) the name or Viewer ID of the user to whom permission is given, where the User ID and Viewer ID are a unique user identification name or 'handle.'" |

SECTION III.C.

| Phrase(s) in Patent | "a system for providing a personal page comprising: . . . (f) means for storing the security parameters in one or more databases." |
|---|---|
| Joint Construction of Function | "storing the security parameters in one or more databases" |
| TPI's Construction of Structure | "a Web server that executes a program to pass the name or user ID of the page creating remote user together with the name or user ID of other remote users to whom the page-creating remote user has given permission to access the page-creating remote user=s personal page in one or more databases" |
| Facebook's Construction of Structure | "database 96 and CGI processor 92 (Fig. 2) programmed to perform the algorithm at col. 10 ll. 22-28." |
| Court's Construction of Structure | "a CGI program that accesses a database on the local computer network for storing permission attributes," as reflected in the specification at col. 10 ll. 23-27 and the description of the CGI program at col. 6 l. 46-col. 7 l.8. |

**SECTION III.D.**

| Phrase(s) in Patent | 10(d): "providing the page-creating remote user with a means for accessing the profile information of other remote users for selecting other remote users to whom the page-creating remote user may wish to allow access to the personal page"; |
| --- | --- |
| | 16(e): "means for the page-creating remote user to access the profile information of other remote users for selecting other remote users to whom the page-creating remote user may wish to allow access to the personal page"; |
| | 23: "The method of claim 1, further comprising providing the page-creating remote user with a means for identifying and selecting at least one other remote user for authorization to view personal page that includes searching user profiles"; |
| | 24: "The method of claim 23, wherein the means for identifying and selecting at least one other remote user includes **[continued]** |

| | |
|---|---|
| | searching profile information"; 29(d): "provide the page-creating remote user with means to select other remote users to whom the page-creating remote user may wish to allow access to the personal page"; 32(d): "means for allowing the page-creating remote user to select other remote users to whom the page-creating remote user may wish to allow access to the personal page". |
| **Joint Construction of Function** | Language following the term "means for" in each claim |
| **TPI's Construction of Structure** | "at least one Web page programmed to retrieve profile information of other remote users and display that profile information for selection by other remote users" or "at least one Web page programmed to search profile information of other remote users and to display the profile information found in the search for selection of another remote user." |
| **Facebook's Construction of Structure** | Indefinite |
| **Court's Construction of Structure** | Indefinite |

SECTION III.E.

| Phrase(s) in Patent | 31: "The computer program product of claim 29, wherein the means to select other remote users includes means for searching user profiles including personal information for other remote users."<br><br>34: "The system of claim 32, wherein the means to select other remote users includes means for searching user profiles including personal information for other remote users." |
|---|---|
| Joint Construction of Function | Language following the term "means" in each claim |
| TPI's Construction of Structure | "at least one Web page programmed to search profile information of other users and to display that profile information found in the search for selection of another remote user." |
| Facebook's Construction of Structure | Indefinite |
| Court's Construction of Structure | Indefinite |

Case 1:09-cv-11686-DPW   Document 314   Filed 09/07/16   Page 74 of 89

**SECTION III.F.**

| Phrase(s) in Patent | "The method of claim 1, further comprising providing means for the page-creating remote user to include a voice greeting in the personal page." |
|---|---|
| Joint Construction of Function | Language following the term "means for" |
| TPI's Construction of Structure | "a Web page programmed to allow the page-creating remote user to transfer an audio file containing a voice greeting to the computer network, the audio file being accessible during the rendering of a personal page so that a viewer of the personal page can hear the voice greeting." |
| Facebook's Construction of Structure | Indefinite |
| Court's Construction of Structure | Indefinite |

**SECTION III.G.**

| | |
|---|---|
| **Phrase(s) in Patent** | "means for providing a page-creating remote user with a plurality of pre-stored page templates for selection for the personal page" |
| **Joint Construction of Function** | Language following the term "means for" |
| **TPI's Construction of Structure** | "a Web page that presents a plurality of templates, the templates being World Wide Web page designs that include graphics and page layout information stored on the computer network as HTML page descriptions, for selection by the page-creating remote user for display on his or her personal page." |
| **Facebook's Construction of Structure** | Indefinite |
| **Court's Construction of Structure** | "a Web page programmed to present to the remote user with a plurality of page templates, finite in number, for selection by the remote user for the personal page." |

**SECTION III.H.**

| | |
|---|---|
| **Phrase(s) in Patent** | 16(a): "means for storing profile information relating to each remote user"<br><br>32(a): "means for storing profile information relating to each remote user, the profile information being accessible to other remote users of the system." |
| **Joint Construction of Function** | Language following the term "means for" |
| **TPI's Construction of Structure** | "a Web server that executes a program to pass profile information of the remote user to one or more databases that store said information together with the name or user ID of the remote user." |
| **Facebook's Construction of Structure** | Indefinite |
| **Court's Construction of Structure** | "a CGI program which accesses a database on the local computer network for storing profile information." |

**SECTION III.I.**

| Phrase(s) in Patent | 29(b): "provide a page-creating remote user with means to create a personal page having personal information"<br><br>32(b): "means for creating a personal page having personal information for a page-creating remote user" |
|---|---|
| **Joint Construction of Function** | Language following the term "means" |
| **TPI's Construction of Structure** | "at least one Web page that provides at least one of:<br><br>at least one field to receive text from the page-creating remote user for display on the personal page<br><br>and<br><br>presenting the page-creating remote user with options to select an image to display on the personal page from a collection of images previously stored or to upload an image, such as a GIF or JPEG image, from the page-creating remote user's remote computer to display on the personal page." |
| **Facebook's Construction of Structure** | "a Web server 86 including database 96 and CGI processor 92 (Fig. 2) programmed to perform the algorithm set forth in Figure 4 (steps 164, 72, 74, 76 and 180) as described in col. 8 l. 43-col. 9 l. 43)." |
| **Court's Construction of Structure** | "a Web page or series of Web pages programmed to provide at least one template for the display of the **[continued]** |

| | |
|---|---|
| | remote user=s personal information and programmed to prompt the page-creating remote user to enter or select text, graphics or other information to be included in a predetermined area of the template(s) and capable of being stored on a local computer network" |

**SECTION III.J.**

| Phrase(s) in Patent | 10(b): "providing a page-creating remote user with a means for contributing text to the personal page"; <br><br> 16(c): "means for the page-creating remote user to contribute text to the personal page." |
|---|---|
| **Joint Construction of Function** | Language following the term "means for" |
| **TPI's Construction of Structure** | "at least one Web page having at least one field to receive text from the page-creating remote user for display on the personal page." |
| **Facebook's Construction of Structure** | "a series of Web pages programmed to allow the remote user to enter text, or a single Web page with a series of fields for entering text, depending on the template selected by the page-creating remote user." |
| **Court's Construction of Structure** | "a Web page or series of Web pages, each having at least one field for entering text, programmed to allow the remote user to enter text for display on a personal page." |

SECTION III.K

| Phrase(s) in Patent | 10(c): "providing the page-creating remote user with a means for contributing graphics to the personal page"<br><br>16(d): "means for the page-creating remote user to contribute graphics to the personal page"<br><br>33: "The system of claim 32, wherein the means for creating a personal page having personal information for a page-creating remote user includes means for placing graphical information on the personal page." |
|---|---|
| Joint Construction of Function | Language following the term "means for" |
| TPI's Construction of Structure | "A Web page presenting the page-creating remote user with options to select an image to display on the personal page from a collection of images previously stored or to upload an image, such as a GIF or JPEG image, from the page-creating remote user=s remote computer to display on the personal page." |
| Facebook's Construction of Structure | "A Web page programmed to present a remote user with background graphics which may be selected for display with the personal page, and presenting the page-creating remote user with options to select an image for display on the remote user=s personal page from a collection of images previously stored **[continued]** |

| | |
|---|---|
| | or to upload an image, such as a GIF or JPEG image, from the page-creating remote user=s remote computer to display on the personal page.  Depending on the template selected, the remote user may be presented with more than one opportunity to select or upload an image." |
| **Court's Construction of Structure** | "a Web page or Web pages programmed to present the remote user with background graphics which may be selected for display with the personal page and/or programmed to present the remote user with the option to select an image for display on the personal page from a collection of images previously stored on a local computer network, or to enter or upload an image, such as a GIF or JPEG image, from the remote user=s remote computer for display on the personal page." |

SECTION III.L

| Phrase(s) in Patent | "means for storing attributes representing the personal information in the page-creating remote user=s personal page in one or more databases." |
|---|---|
| Joint Construction of Function | Language following the term "means for" |
| TPI's Construction of Structure | "a Web server that executes a program to pass attributes representing the personal information of the page-creating remote user to one or more databases that store said attributes together with the name or user ID of the page-creating remote user." |
| Facebook's Construction of Structure | "a Web server including database 96 and CGI processor 92 (Fig. 2) programmed to perform the algorithm set forth in col. 10 ll. 6-14." |
| Court's Construction of Structure | "a CGI program to store attributes representing the personal information entered and selections made by the remote user for the display of the personal page in a database on the Local Computer Network by inserting rows containing the information into a User Information Table 126 and Personal Values Table 152." |

SECTION III.M

| Phrase(s) in Patent | "means for displaying the personal page only to authorized remote users." |
|---|---|
| Joint Construction of Function | Language following the term "means for" |
| TPI's Construction of Structure | "at least one Web page that allows a remote user to select a personal page of a page-creating remote user that the remote user is authorized to see based upon a stored security attribute, and executing a program to assemble the attributes of the selected personal page from one or more databases to display that personal page in the manner of a World Wide Web page." |
| Facebook's Construction of Structure | "Display 308 and CGI processor 92 (Fig. 2) programmed to implement the algorithm described in specification at col. 11 ll. 4-21." |
| Court's Construction of Structure | "A Web page programmed to present a remote user with a list of users who have given the remote user permission to see their personal pages, generated by a CGI program which reviews the Security Attribute Table for records indicating permissions given to the remote user.  When a remote user chooses to view a personal page from this list, a CGI program is executed on the Web server as described at col. 11 ll. 8-21." |

**SECTION III.N**

| Phrase(s) in Patent | "Prompt" and "Prompting" |
|---|---|
| TPI's Construction | "urging (a remote user) to provide information" |
| Facebook's Construction | "requiring (a remote user) to make a selection, give an answer, or enter information." |
| Court's Construction | "requesting that (a remote user) provide information." |

SECTION III.O

| Phrase(s) in Patent | "Page" |
|---|---|
| TPI's Construction | "web page" |
| Facebook's Construction | No need to construe |
| Court's Construction | No need to construe |

SECTION III.P

| Phrase(s) in Patent | "Page template(s)" |
|---|---|
| TPI's Construction | "a Web page having a World Wide Web style page design which includes graphics and layout information." |
| Facebook's Construction | "a template with a number of fields that may include user entries or selections for personalizing the personal page." |
| Court's Construction | "a template with at least one field for the inputting of the remote user's personal information." |

**SECTION III.Q**

| Phrase(s) in Patent | the "providing" or "prompting" of the page-creating remote user "with a plurality of page templates." |
| --- | --- |
| TPI's Construction | No construction needed beyond construction of constituent terms |
| Facebook's Construction | "requiring a page-creating remote user to choose a page template from two or more different page templates, each page template specifying one or more categories of information for placement on the personal page and the location of the categories on the personal page." |
| Court's Construction | "requiring a page creating remote user to choose a page template from two or more different page templates, each page template specifying one or more categories of information for placement on the personal page and the location of the categories on the personal page." |

**SECTION III.R**

| Phrase(s) in Patent | "Profile information" |
|---|---|
| TPI's Construction | No construction required |
| Facebook's Construction | "information regarding a remote user and regarding the type of person that the remote user would like to meet" |
| Court's Construction | "information regarding the remote user and regarding the type of person that the remote user would like to meet, for the purpose of making it accessible and/or searchable by other remote users." |

| Phrase(s) in Patent | "Profile information . . ." accessible to other remote users |
|---|---|
| TPI's Construction | "information that can be viewed by remote users including remote users who have not been authorized to view the information owner's personal page (if any)." |
| Facebook's Construction | No construction required |
| Court's Construction | No construction required |

### SECTION III.S

| | |
|---|---|
| **Phrase(s) in Patent** | "Attribute(s)" |
| **TPI's Construction** | "representations of information used to display the personal page." |
| **Facebook's Construction** | No construction required |
| **Court's Construction** | Representation(s) |

### SECTION III.T

| | |
|---|---|
| **Phrase(s) in Patent** | "Display" or "Displaying" |
| **TPI's Construction** | "serving a Web page" |
| **Facebook's Construction** | "visually presenting" |
| **Court's Construction** | "'printing,' in the manner of a World Wide Web page." |

### SECTION III.U

| | |
|---|---|
| **Phrase(s) in Patent** | "access(ing) (by a remote user)" |
| **TPI's Construction** | "viewing (by the remote user)." |
| **Facebook's Construction** | No construction required |
| **Court's Construction** | No construction required |

### SECTION III.V

| | |
|---|---|
| **Phrase(s) in Patent** | "Authorization," "Authorized" and "Authorizing" |
| **TPI's Construction** | No construction required |
| **Facebook's Construction** | "authorization" and "authorized": "the state in which the system allows a remote user to access the personal page"<br><br>"authorizing": "setting the state in which the system allows a remote user access to the personal page." |
| **Court's Construction** | No construction required |

## SECTION III.W

| Phrase(s) in Patent | "Remote user" |
|---|---|
| TPI's Construction | "a person who is able to use a claimed system or method over a computer network" |
| Facebook's Construction | "a person who is able to create or view a personal page" |
| Court's Construction | "a person who is able to use a claimed system or method over a computer network" |

## SECTION III.X

| Phrase(s) in Patent | "page-creating remote user" |
|---|---|
| TPI's Construction | "a remote user who is creating or has created a personal page by entering information for display on the personal page" |
| Facebook's Construction | "a remote user who is creating a personal page" |
| Court's Construction | "a remote user who is creating or has created a personal page" |