UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TELE-PUBLISHING, INC.,               )
                                     )
          Plaintiff,                 )
                                     )        CIVIL ACTION NO.
     v.                              )        09-11686-DPW
                                     )
FACEBOOK, INC., and                  )
THEFACEBOOK, LLC,                    )
                                     )
          Defendants.                )


MEMORANDUM AND ORDER
May 11, 2017

     Plaintiff Tele-Publishing, Inc. ("TPI") and defendants
Facebook, Inc. and TheFacebook, LLC (collectively "Facebook")
have presented various dispositive motions to resolve this
computer program patent dispute.  The focus of the instant
memorandum will be the respective requests for summary
disposition regarding the validity of the asserted claims of
U.S. Patent No. 6,253,216 (the "'216 Patent") under 35 U.S.C. §
101, which governs whether the subject matter is patentable as
assessed through the framework of *Alice Corp. Pty. Ltd.* v. *CLS
Bank Intern.*, 134 S. Ct. 2347 (2014).  Because I conclude the
subject matter of the '216 Patent is not patentable, I will
direct the clerk to enter final judgment for the defendants,
resolving this case.

## I. BACKGROUND

### A. *The Patent*

On June 26, 2001, the Patent and Trademark Office ("PTO") issued the '216 Patent to TPI. The claimed invention "relates to a method and apparatus for providing a personal page over a computer network. More particularly, the method and apparatus provide users with a secure way to display personal information to other computer network users." '216 Patent col 1. l. 14-18.

The patent discusses the history of "personals" sections in newspapers and explains how with "the advent of the Internet's World Wide Web, systems for providing personals advertisements on networked computer systems have appeared." *Id.* at col. 1. ll. 28-32. These web-based systems "consist largely of the same information that is available in the newspaper advertisements" and "merely mimic the newspaper advertisements" rather than taking advantage of the new technological format. *Id.* at col. 1. ll. 37-40.

According to the patent, existing networked computer systems for providing personals advertisements have several major shortcomings. First, if the system allows users to customize their personal pages, the system "often requires that the user be able to generate the page using a programing language or other protocol" even though "many users of personals

are not familiar with such languages." *Id.* at col. 1. ll. 59-64. Second, existing systems that use standard web pages "provide no privacy" to users because "the Internet allows access by users world-wide" and "a relatively large number of Internet users exist." *Id.* at col. 1. ll. 65-68, col. 2. l. 1. "With such a large number of users, it is desirable to restrict access to information on some pages or even to restrict access to some pages." '216 Patent col. 2. ll. 3-6. Finally, existing systems struggle "to direct a desired audience to a particular page. The owner of such a page must simply hope that the desired audience, out of some tens of millions of users, finds the page." *Id.* at col. 2. ll. 8-11.

The '216 Patent purports to address the shortcomings of earlier systems. The invention is designed "to provide a secure method for providing personal information in a network environment which makes use of the multimedia opportunities available on such a medium and makes the information available in a private way, i.e., only to those people that the person providing the information wishes to see the information." *Id.* at col. 2. ll. 12-18.

**Claim 1** recites:

A method for providing a personal page on a computer system accessible to a plurality of remote users through a computer network, the remote users having profile information stored in the computer network and accessible to other remote users, comprising the steps of:

a) acceptable [sic] [accepting] profile information from a plurality of remote users;

b) prompting a page-creating remote user with a plurality of page templates for the personal page and receiving a template selection from the remote user;

c) prompting the page-creating remote user to enter text to the personal page and receiving entered text from the remote user;

d) prompting the page-creating remote user to select or enter graphical information to display on the personal page and receiving the selection or entry from the remote user;

e) storing attributes representing each selection or entry made by the page-creating remote user in one or more databases;

f) providing the page-creating remote user with means to input security parameters for the personal page, the security parameters specifying authorization of at least one other remote user to access the personal page;

g) storing the security parameters in one or more databases; and

h) displaying the personal page upon request only to remote users who are authorized to access the personal page. *Id.* at col. 12 ll. 48-67, col. 13 ll. 1-9.

Claims 2, 9, 25, and 26 depend upon Claim 1.[1]

---

[1] **Claim 2** recites "[t]he method of claim 1, wherein each page template is stored as a plurality of rows in one or more databases on the computer system." '216 Patent col. 13 ll. 10-12.

**Claim 9** recites "[t]he method of claim 1, wherein only graphics having a smaller storage size than a predetermined storage size may be entered by a user." *Id.* at col. 13 ll. 36-38.

**Claim 25** recites "[t]he method of claim 1, wherein the page-creating user may grant authorization to view the personal page to another remote user when sending an electronic mail message to that other remote user." *Id.* at col. 15 ll. 27-30.

**Claim 26** recites "[t]he method of claim 1, wherein when the page-creating user authorizes a remote user to view the personal page, an electronic mail message is sent by the computer system to the authorized remote user indicating to that user that the user may view the personal page of the page-creating remote user." *Id.* at col. 15 ll. 31-36.

Similarly, **Claim 21** recites:

A computer program product comprising computer useable
medium having computer readable program code to:

(a) prompt a page-creating remote user with a plurality of
page templates for displaying personal information and to
receive a template selection from the remote user;
(b) prompt the page-creating remote user to enter text to
the personal page and to receive entered text from the
remote user;
(c) prompt the page-creating remote user to select or enter
graphical information to display on the personal page and
to receive the selection or entry from the remote user;
(d) store attributes representing each selection or entry
made by the page-creating remote user in one or more
databases;
(e) provide the page-creating remote user with means to
input security parameters for the personal page, the
security parameters specifying authorization of at least
one other remote user to view the personal page;
(f) store the security parameters in one or more databases;
and
(g) display the personal page only to remote users who are
authorized to access the personal page. *Id.* at. col. 14,
ll. 56-67, col. 15 ll. 1-11.

Claim 22 depends upon Claim 21.[2]

**B.     *The Procedural History***

On October 7, 2009, TPI initiated this litigation against

Facebook alleging that Facebook's products infringed the '216

Patent.  Facebook responded on November 11, 2009 with

counterclaims alleging, *inter alia*, that the '216 patent is

---

[2] **Claim 22** recites "[t]he method of claim 21, wherein the
computer readable program code to display the personal page to
an authorized remote user includes computer readable program
code to retrieve the attributes representing selections or
entries by the page-creating user, and graphically displaying
the page-creating user's selections and entries using the
selected page template."  '216 Patent, col. 15 ll. 12-18.

invalid.  On December 22, 2009, Facebook submitted a request to the PTO for *ex parte* reexamination of the '216 Patent. Facebook's reexamination request raised questions of patentability based on prior art not cited in the original prosecution of the '216 Patent.  On November 5, 2010, the PTO issued an Office Action affirming rejection of all claims of the '216 Patent.  The Board of Patent Appeals and Interferences, however, on February 23, 2012 reversed the PTO's decision, holding that the PTO erred in finding that the claims were anticipated or made obvious by prior art.

After the return of the case to this court as the forum for resolution of the dispute, I issued my September 7, 2016 Memorandum and Order ("*Markman* Order") in which I construed the claims of the '216 Patent and found claims and claim elements 10(d), 16(e), 23, 24, 27, 29(d), 32(d), 31, and 34 invalid as indefinite.  *Tele-Publishing, Inc.* v. *Facebook, Inc.*, 205 F. Supp. 3d 142, 158-61 (D. Mass. 2016).  On December 1, 2016, I denied TPI's motion for reconsideration as to my finding that claims 31 and 34 were invalid as indefinite.  *Tele-Publishing, Inc.* v. *Facebook, Inc.*, No. 09-11686-DPW, ---F. Supp. 3d---, 2016 WL 7042063, at *3 (D. Mass. Dec. 1, 2016).  In light of the *Markman* Order as reaffirmed, the parties pressed dispositive motion practice on multiple fronts, including the question of

patentability raised by Facebook's motion #366 and raised in
part by TPI's motion #369.

## II. DISCUSSION

### A. *Summary Judgment*

A court will grant summary judgment "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed R. Civ.
P. 56. At this stage, I read the facts in the light most
favorable to the non-moving party and draw all reasonable
inferences in its favor. *Ramos-Santiago* v. *United Parcel Serv.*,
524 F.3d 120, 122 (1st Cir. 2008). I likewise "view the record
'through the prism of the evidentiary standard of proof that
would pertain at a trial on the merits . . . Thus, a moving
party seeking to invalidate a patent at summary judgment must
submit such clear and convincing evidence of invalidity so that
no reasonable jury could find otherwise.'" *Exergen Corp.* v.
*Brooklands*, 125 F. Supp. 3d 307, 312 (D. Mass. 2015) (quoting
*Eli Lily Co.* v. *Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir.
2001)).[3]

---

[3] As I discussed in *Exergen*, "[w]hether an inquiry into patentable
subject matter under § 101 is subject to the same presumption of
validity has recently become a matter of debate." *Exergen Corp.*
v. *Brooklands*, 125 F. Supp. 3d 307, 311 (D. Mass. 2015). For
now, I continue to apply the clear and convincing standard,
although I view the presumption of validity as having "less
significance in the context of a largely legal determination"
like a § 101 inquiry. *Id.* at 312.

**B. *Invalidity Under 35 U.S.C. § 101 and* Alice**

Section 101 of the Patent Act establishes the subject matter which may receive patent protection. As a conceptual matter, the Supreme Court has "'long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable. . .'" because they represent "'the basic tools of scientific and technological work.'" *Alice*, 134 S. Ct. at 2354 (quoting *Association for Molecular Pathology* v. *Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)).

In order to "distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more," the Supreme Court in *Alice* directed a two-part inquiry for determining patent eligibility under § 101. *Id.* (quoting *Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1303 (2012)). Under the first step, I "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 2355. If I find that they are, I proceed to the second step, where I "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1298, 1297).

In the wake of *Alice*, the Federal Circuit has issued a number of decisions involving § 101 challenges to patents and has begun to refine the path for the two steps of the *Alice* protocol. According to the Federal Circuit, at the first step, a court should consider, as alternatively stated, "the focus of the claims," *Elec. Power Grp.; LLC* v. *Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016); their "character as a whole" or the "basic character of the subject matter," *Internet Patents Corp.* v. *Active Network, Inc.*, 790 F.3d 1343, 1346 1348 (Fed. Cir. 2015); or their "basic thrust," *Bascom Global Internet Servs., Inc.* v. *AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016).[4]

---

[4] TPI argues for a narrower view of the first step, relying on the Federal Circuit's recent decision in *Thales Visionix Inc*. v. *United States*, 850 F.3d 1343 (Fed. Cir. 2017). In *Thales*, the Federal Circuit cautioned courts to "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Id.* at 1347. The court proceeded to discuss the claims in detail and concluded that they were not directed to an abstract idea. *Id.* at 1347-49. I understand *Thales* to reaffirm the importance of step one, but not to change its scope. The two *Alice* steps "are plainly related" *Elec. Power Grp.*, 830 F.3d at 1353 and are not always separated distinctly by the Federal Circuit. *See, e.g., McRO, Inc.* v. *Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps."). At times, "there can be close questions about when the inquiry should proceed from the first stage to the second." *Elec. Power Grp.*, 830 F.3d at 1353. Even in light of *Thales*, I view the first step as a distinct and separate inquiry in which I examine the basic character of the claims as a whole in order to determine whether they are directed to an abstract idea.

Although the first step analyzes the basic character of the claims, the step remains "a meaningful one, sometimes ending the § 101 inquiry." *Elec. Power Grp.*, 830 F.3d at 1353. Because neither the Supreme Court nor the Federal Circuit has "established a definitive rule to determine what constitutes an 'abstract idea,'" both "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC* v. *Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

If a court reaches the second step, it looks "more precisely at what the claim elements add," *Elec. Power Grp.*, 830 F.3d at 1353, and determines whether the "specific improvements" identified "go beyond 'well-understood routine, conventional activit[ies]' and render the invention patent-eligible." *Bascom*, 827 F.3d at 1348 (quoting *Alice*, 134 S. Ct. at 2359). In the second step, a court will "'search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Intellectual Ventures I LLC* v. *Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2355).

*A.* **Alice** *Step One*

Facebook argues that the '216 Patent is directed to the abstract idea of collecting and storing a person's personal information, and sharing it with selected other persons. TPI contends that this categorization ignores key limitations placed on the claims through both the specification within the patent and my claim construction. According to TPI, the claims are directed to three problems of particular concern to publishing personals online: the lack of privacy on the Internet, which the claims purport to solve by using security parameters to provide restricted access to a user's personal page; the challenge of targeting audiences online, which the claims purport to solve by making a user's profile information accessible; and the difficulty of customizing personal pages online, which the claims purport to solve by enabling users to create personal pages without using programming languages.

I conclude that the focus, the character, the basic thrust of the relevant claims in the '216 Patent is directed to the abstract idea of collecting, storing, and selectively sharing personal information. *Elec*. *Power Grp.*, 830 F.3d at 1353. The section on the field of the invention, when speaking "[m]ore particularly," states that the method and apparatus recited "provide users with a secure way to display personal information

to other computer network users." '216 Patent col 1. l. 14–18.
The additional details provided in the claim elements do not
appear to alter the "basic character of the subject matter" of
the claims. *Internet Patents Corp.*, 790 F.3d at 1348. Rather,
they simply set out the steps the system takes to collect and
store personal information and the steps users may take to share
selectively their personal information. Because I find the
claims and their limitations "do not readily lend themselves to
a step-one finding that they are directed to a nonabstract
idea," I will defer consideration of whether these steps are
sufficient to narrow or transform the claims until step two.
*Bascom*, 827 F.3d at 1349.

The claims in the '216 Patent are similar to claims which
in the post-*Alice* period the Federal Circuit has found to be
directed to abstract ideas, and are strikingly similar to claims
several district courts have found to be directed to abstract
ideas.

### 1.   Federal Circuit Case Law

In *Bascom Global Internet Services, Inc.* v. *AT&T Mobility
LLC*, the court stated that claims directed to "filtering content
on the Internet" were directed to an abstract idea because
filtering content "is a longstanding, well-known method of
organizing human behavior." 827 F.3d at 1348. The court noted

that "[a]n abstract idea on 'an Internet computer network' or on a generic computer is still an abstract idea." *Id.*

In *Content Extraction and Transmission LLC* v. *Wells Fargo Bank, National Association*, the court considered claims that "generally recite a method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory." 776 F.3d 1343, 1345 (Fed. Cir. 2014). The court held those claims were directed to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Id.* at 1347. The Federal Circuit observed that:

> The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions. And banks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of account holder, and stored that information in their records. *Id.*

Finally, in *Cyberfone Systems, LLC* v. *CNN Interactive Group, Inc.*, an unpublished decision issued a few months before *Alice* that I find remains instructive and persuasive, the court considered claims that recited a method of "obtaining data, 'exploding' the data, *i.e.*, separating it into component parts, and sending those parts to different destinations." 558 Fed. App'x 988, 990 (Fed. Cir. 2014). The court held that the claims

13

were directed to the abstract idea of "collecting information in classified form, then separating and transmitting that information according to its classification," stating that "using categories to organize, store, and transmit information is well-established." *Id.* at 992.

   2.   District Court Case Law

In parallel with such Federal Circuit precedent, several district courts have found patents involving the collecting, storing, and processing of information in some way, including selectively sharing information, to be directed to abstract ideas. In *Zkey Investments* v. *Facebook*, Judge Lew of the Central District of California considered a patent for what the plaintiff characterized as a "networked, real-time electronic information exchange system that permits a user to exercise granular control over access to specific data elements in a user profile stored by a database management system." No. CV 16-00782-RSWL-KS, ---F. Supp. 3d---, 2016 WL 7046593, at *4 (C.D. Cal. Dec. 2, 2016). He determined that "the computer-related terms used by Plaintiff do not change the purpose of the '204 Patent—users are able to have control of what information is stored in the database and who has access to the information as it is updated in real-time." *Id.* He concluded that the claims of the patent were "directed towards the abstract idea of

collecting, storing, and sharing information of registered users with other registered and non-registered users." *Id.* at *6.

In *Zak* v. *Facebook*, Judge Berg of the Eastern District of Michigan considered two patents with claims "directed to enabling users, without third-party assistance, to post content to a website and to control which users can view the posted content." 206 F. Supp. 3d 1262, 1264-65 (E.D. Mich. 2016). Much like the '216 Patent now before me, the patents at issue in *Zak* sought to "giv[e] users the ability to manage the content of a website without having to depend on a person skilled in HTML computer programming." *Id.* at 1264. The inventors in *Zak* also "realized that the software would be more useful if users could control which other users could *view* content on the website and which other users could *post* content on certain web pages." *Id.* (emphasis in original). Looking to *Bascom*, Judge Berg found the claims in the patents were directed to "group collaboration with targeted communication and restricting public access, which—like filtering data—are arguably methods of organizing human behavior" and therefore concluded that the claims were directed to an abstract idea. *Id.* at 1270.

Similarly, in *SkillSurvey, Inc.* v. *Checkster LLC*, Judge Jones in the Eastern District of Pennsylvania considered a patent that "relates to a human resource management system, and more particularly to a system for collecting and analyzing

information from references identified by job candidates." 178
F. Supp. 3d 247, 252 (E.D. Pa. 2016). He held the patent was
directed to the abstract idea "of soliciting, storing, and
analyzing of information provided by references in such a way as
to hedge the risk of receiving incomplete or inaccurate
responses from references during the hiring process." *Id.* at
256.

Finally, in *Listingbook, LLC* v. *Market Leader, Inc.*, Judge
Biggs of the Middle District of North Carolina considered a
claim in a patent that disclosed:

> a method of providing a real estate agent and two clients
> with access to a database of real estate information,
> monitoring the actions of the agent and clients as they
> access that information, generating and storing the
> information they access, and providing some client-accessed
> information to the agent and some agent-accessed
> information to the clients, so that each has "knowledge of
> the actions" of the other. 144 F. Supp. 3d 777, 786-87
> (M.D.N.C. 2015).

She held that the claim "is directed to the abstract ideas of
information exchange (sharing) and collaboration." *Id.* at 788.

### 3.   Conclusion

After reviewing the developing case law regarding the *Alice*
approach in settings similar to that before me, I conclude that
the relevant claims in the '216 Patent are directed to the
abstract idea of collecting, storing, and selectively sharing
personal information. Having determined that the claims are

directed to an abstract idea, I now turn to the second step of the *Alice* inquiry.

**B.   Alice *Step Two***

Facebook contends that the '216 Patent does not contain sufficient specific improvements to render the invention patent-eligible.  Facebook asserts that the '216 Patent merely combines a computer-implemented version of a newspapers personals section with the abstract idea of limiting access to personal information to selected users.  TPI argues that Facebook oversimplifies the claim elements of the '216 Patent.[5]  According to TPI, when the claim elements are considered as an ordered combination, they create a two-tiered system for sharing personal information, in which users have both private personal pages protected by security features and unrestricted profile information accessible to the online public at large.

---

[5] TPI also asserts that Facebook improperly focuses on whether the claims of the '216 Patent are novel, an inquiry more appropriate for a 35 U.S.C. § 102 challenge, instead of whether they are inventive concepts, the proper focus of a § 101 challenge. *Bilski* v. *Kappos*, 561 U.S. 593, 620 (2010) (Stevens, J., concurring) ("'The proper construction of § 101 . . . does not involve the familiar issu[e] of novelty' that arises under § 102.") (quoting *Parker* v. *Flook*, 437 U.S. 584, 588 (1978)).  Of course, the novelty inquiry of § 102 remains separate and distinct from that of § 101.  *Intellectual Ventures I*, 838 F.3d at 1315.  Having found that the claims of the '216 Patent are directed to an abstract idea, however, I must ensure that the claims possess an inventive concept sufficient for me to conclude "'that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

The claims rely on generic technologies, such as web browsers, URLs, HTTP servers, and HTML pages, which are not sufficiently inventive, in and of themselves, to render the claims non-abstract. Element (f) of claim 1, which discusses the selection of "security parameters," does not describe any specific type of security improvement. The '216 Patent describes how in the security attribute table, "a permission attribute, consisting of the name of the remote user (User ID 202) wishing to give permission and the user to whom permission is given (Viewer ID 204), may then be stored in a database on the local computer network by a CGI program executing on a CGI processer 92." '216 Patent col. 10 ll. 23-25.[6]

The "security parameters" recited in the claim elements of claims 1 and 21, even when considered in light of my construction, are not sufficiently inventive to transform the claims into patent-eligible applications. "General privacy protections are not considered sufficiently inventive" to save a claim directed to an abstract idea. *Whitepages, Inc*. v. *Isaacs*, 196 F. Supp. 3d 1128, 1136 (N.D. Cal. 2016). I construed the

---

[6] Other sections of the specification reflect the general technologies and techniques being used. The specification explains that the databases may be accessed "by having query commands embedded in the CGI programs" that "may be provided in Structured Query Language (SQL) . . . an industry standard query language which allows access to data in relational database management systems such as database systems for example." '216 Patent col. 6 ll. 65-67, col. 7 ll. 1-4.

terms "security attribute" and "security parameter" as
"information consisting of both (1) the name or User ID of the
page-creating remote user, and (2) the name or Viewer ID of the
user to whom permission is given, where the User ID and Viewer
ID are a unique user identification name or 'handle.'" *TPI*, 205
F. Supp. 3d at 157. I construed the structure for the claim
element "describing means for the page-creating remote-user to
enter or input security parameters or attributes granting
permission to others to view the personal page" found in several
of the claims at issue to include "a Web page programmed to
prompt the page-creating remote user for the name or User ID of
the remote user to whom the page-creating remote user wishes to
give permission to view the page-creating remote user's personal
page, and to create a security attribute/parameter" or "a Web
page that prompts the page-creating remote user to send an
electronic mail message to the user to whom the remote user
wishes to give permission, giving the remote user an option to
give permission to view the personal page, and creating a
security attribute/parameter." *Id.* at 154.

The security feature of the claims involves three steps: 1)
the user enters the name of a person who will be given access,
2) the system stores the name in a list, 3) the system compares
a visiting user's name to the list and grants access if the
user's name is on the list. Such a basic security measure is

not a sufficiently inventive concept. *Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 715-16 (Fed. Cir. 2014) ("Adding routine additional steps such as . . . restrictions on public access, and use of the Internet does not transform an otherwise abstract idea into patent-eligible subject matter."). In *CyberSource Corp.* v. *Retail Decisions, Inc.*, the Federal Circuit held that a claim for a method of detecting fraud in credit card transactions that consisted of obtaining transaction information associated with an IP address, storing the transaction information in a list, and utilizing the list to determine if the transactions are fraudulent was invalid because all three steps could "be performed in the human mind." 654 F.3d 1366, 1372-73 (Fed. Cir. 2011).[7] Here, the security feature similarly recites steps that could be performed using a pencil and paper or the human mind. A host of an event checking names on a guest list or recalling from memory who had been invited to the party would appear to employ the same security feature recited in the claims.

---

[7] *CyberSource* was decided before *Alice* and therefore did not by terms employ *Alice*'s two-step framework. The Federal Circuit has since reaffirmed *CyberSource* in decisions using the *Alice* framework, discussing *CyberSource* both at step one, *Versata Dev. Grp., Inc.* v. *SAP Am., Inc.*, 793 F.3d 1306, 1333-34 (Fed. Cir. 2015) and at step two, *Intellectual Ventures I LLC* v. *Capital One Bank (USA)*, 792 F.3d 1363, 1368-69 (Fed. Cir. 2015).

Nor does the security feature offer a new solution to a technological problem. To be sure, "[w]here a patent arguably directed toward an abstract idea nevertheless addresses a technological problem and offers a new solution for that problem, it may be recognized as including an inventive concept which will make it eligible for patent protection." *Zak*, 206 F. Supp. 3d at 1269. The problem of securing personal information may take on new dimensions in the digital age, but it is not an inherently technological problem. *OpenTV, Inc.* v. *Apple, Inc.*, No. 14-CV-01622-HSG, 2015 WL 1535328, at *4 (N.D. Cal. Apr. 6, 2015) ("The problem of how to transmit, receive, store, and organize confidential information deriving from multiple sources is not a creature of the Internet age: solutions to this problem date back to the invention of smoke signals."). TPI presents the claims as an "Internet-centric solution" to an Internet problem, but talismanic invocations of the Internet will not alone transform an abstract idea. *DDR Holdings, LLC* v. *Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014) ("[N]ot all claims purporting to address Internet-centric challenges are eligible for patent.").[8]

---

[8] TPI's effort to frame the claims of the '216 Patent in line with the claims considered in *DDR Holdings* is unavailing. The patents in *DDR Holdings* were directed to "systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant." 773 F.3d at 1248. The Federal Circuit held the

When the claim elements are read together, the system TPI puts forward as an inventive concept simply allows for the designation of some information onto a personal page and other information as unrestricted and searchable profile information. In *Zkey*, Judge Lew found a system "whereby users input either pre-defined or 'dynamically' new user information and from that select either other registered or non-registered users from whom may or may not have access to the user's information" recited routine and conventional activities that were not sufficiently inventive to transform the claim. 2016 WL 7046593, at *7. Just as a similar system of selective information sharing was not sufficiently inventive to transform the claims in *Zkey*, the two-tiered system that emerges from combining the claim elements of the '216 Patent does not save it from invalidity.

---

claims contained a sufficiently inventive conceptive to be patent-eligible because they advanced a solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257. The court stated that the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same" but instead "recite a specific way to automate the creation of a composite web page by an 'outsource provider' that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet." *Id.* at 1259.

Here, the claims of the '216 Patent do not recite a specific solution to the problem of privacy on the Internet beyond a two-tiered system of information sharing. In turn, the claims purport to preempt every application of idea of selectively sharing personal information through a two-tiered system where some information is publically displayed while other information is held back.

TPI relies heavily on *Zak*, in which claims similar to those of the '216 Patent were found to possess an inventive concept even though they were directed towards an abstract idea. 206 F. Supp. 3d at 1271-73. In *Zak*, Judge Berg found claims directed to the abstract ideas of "group collaboration with targeted communication and restricting public access" possessed an inventive concept because they specified a solution to "a business challenge particular to the Internet, namely allowing ordinary users to maintain dynamic websites by managing the content of websites and controlling users' interactions with web pages." *Id.* at 1270, 1273 (citing *DDR Holdings*, 773 F.3d at 1257). He further found that the ordered combination of claim limitations in the patent narrowed the manner in which users "will be able to control interactions on their web pages." *Id.* at 1273 (citing *Bascom*, 827 F.3d at 1350-52).

As did the solution offered by the claims in *Zak*, the solution offered by the claims of the '216 Patent falls somewhere on the spectrum of "a technology-based solution . . . that overcomes existing problems with other" computer-based systems and "an abstract-idea-based solution implemented with generic technical components in a conventional way." *Bascom*, 827 F.3d at 1351. As the Federal Circuit continues further to illuminate the precise dimensions of this spectrum, it is useful to return to the underlying purpose of the § 101 inquiry, which

is to ensure "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1301). I find that characterizing the two-tiered system as an inventive concept "'would risk disproportionately tying up'" others' use of the abstract idea of collecting, storing, and selectively sharing personal information, whether in the physical or digital world. *Id.* at 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

Moreover, I conclude that the dependent claims do not contain the inventive concepts needed to transform them into patent-eligible applications. *Zkey*, 2016 WL 7046593, at *5 (finding claims invalid that were "mostly dependent claims on claim 1 and are the means by which information is collected, analyzed, and displayed based on the user's granting or denial of access to other registered and non-registered users."[9]

---

[9] Dependent claims 2 and 9 recite the methods of claim 1 and are likewise directed to the same abstract idea. Dependent claim 2 adds only that each page template is stored as a plurality of rows in one or more databases on the computer system, an addition which does not transform the claim into a patentable application. Dependent claim 9 recites only the addition of graphics by the user, which again is not sufficient to transform the abstract idea. Dependent claim 22 is directed to the same abstract idea of claim 21 and recites the function of retrieving the selections or entries by the user and displaying the selections using the selected page template. The displaying of the selections from claim 21 does not transform the dependent claim from an abstract idea. Dependent claims 25 and 26 are directed to the same abstract idea of claim 1 but add the use of

### IV.   CONCLUSION

For the reasons discussed more fully above, I grant
Facebook's motion [Dkt. No. 361] for summary judgment and find
the asserted claims of the '216 Patent invalid under 35 U.S.C. §
101.   In turn, I deny TPI's motion [Dkt. No. 369] for summary
judgment in part and treat it as moot in part.

With respect to the remaining outstanding matters, I treat
as moot Facebook's motion [Dkt. No. 343] to strike new
infringement theories, Facebook's motion [Dkt. No. 359] for
summary judgment of non-infringement, Facebook's motion [Dkt.
No. 360] to exclude the testimony of Phillip Green, Facebook's
motion [Dkt. No. 366] for summary judgment of invalidity as to
claims 21 and 22, and Facebook's motion [Dkt. No. 409] to strike
the declaration of Dr. Latanya Sweeney.

The Clerk shall enter final judgment for defendants
declaring the '216 Patent to be invalid because its subject
matter is not patentable.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

email to grant authorization.  The use of email is not
sufficient to transform the abstract idea.  *Intellectual
Ventures I*, 838 F.3d at 1317-19.